UNITED STATES DISTRICT COURT
<u>NORTHERN DISTRICT OF NEW YORK</u>

JUNEAU WANG,

                         Plaintiff,

        -against-                                          1:21-CV-1023 (LEK/DJS)

BETHLEHEM CENTRAL SCHOOL
DISTRICT and JODY MONROE,

                         Defendants.

_____

<u>**MEMORANDUM-DECISION AND ORDER**</u>

## I.      INTRODUCTION

Plaintiff Juneau Wang brings this action against the Bethlehem Central School District ("the District") and Jody Monroe, the superintendent of the District, alleging violation of his rights as set forth in the Constitution of the United States and federal law as well as violation of various state laws and rights created by state common law doctrines. Dkt. No. 4 ("Amended Complaint" or "Complaint"). Now before the Court is Defendants' motion to dismiss. Dkt. Nos. 14 ("Motion to Dismiss"), 14-1 ("Defendant's Memorandum"). Plaintiff has responded, Dkt. Nos. 17 ("Response"), and Defendant has replied, Dkt. No. 18 ("Reply").

For the reasons that follow, the Court grants Defendants' Motion to Dismiss in part and denies in part.

## II.     BACKGROUND

The following factual allegations are assumed to be true in evaluating the Motion to Dismiss. See <u>Vega v. Hempstead Union Free Sch. Dist.</u>, 801 F.3d 72, 76 (2d Cir. 2015).

In January 2018, when Plaintiff was a sophomore at Bethlehem Central High School, he created a computer-generated, tournament-style bracket ("Bracket") that reflected voting by

Plaintiff and a few friends regarding 64 girls, mostly classmates, to determine "the two most liked or admired girls." Compl. ¶ 59. The Bracket was created off-campus at Plaintiff's home using software available through the internet. Id. ¶ 60. The Bracket did not use photos, but merely listed the names of the girls. Id. ¶ 62. Plaintiff and the other boys intended that the bracket and opinions expressed therein would remain private and would not be disclosed to others or publicly disseminated. Id. ¶ 63.

Months later, a female student in Plaintiff's class discovered the Bracket while doing an internet search. Id. ¶ 19. This female student and others then disseminated the Bracket publicly. Id.

In April of 2018, the Principal of Bethlehem Central High School, David Doemel, investigated the Bracket, finding that Plaintiff and his friends had not intended to harm, harass, or objectify anyone and had expected the Bracket to remain private. Id. ¶ 32. Nonetheless, Principal Doemel instituted "remedial directives," including a written apology by Plaintiff for his actions, and guided Plaintiff in resolving the matter. Id. ¶¶ 34, 42, 46.

In 2019, Plaintiff published a book ostensibly concerning his experiences creating the Bracket and the backlash to it. Id. ¶ 64. On page 186 of his book, Plaintiff observes that "if girls made a bracket of guys, guys would laugh it off." Id.

In Spring of 2020, during Plaintiff's senior year, the Bethlehem Central High School Speech Committee, comprised of Principal Doemel, Hall Principal Nicole Conway, and 7 other teachers and advisors, instituted a competition to choose a student who would be given the opportunity to speak at the upcoming graduation ceremony. Id. ¶¶ 6–7. The Speech Committee stated it would choose a speech based on merit, in accordance with the contest goals, standards, and rules. Id. ¶ 7.

Plaintiff submitted a speech for consideration, referred to as the "Resilience Speech," which focused on overcoming adversity. Id. ¶ 9. On June 1, 2020, Plaintiff's speech was unanimously selected by the Committee and publicly announced. Id. ¶¶ 10–12.

That same month, Defendant Monroe, the superintendent of Bethlehem Central School District, received complaints from female students and their parents objecting to Plaintiff's selection as a graduation speaker due to his creation of the Bracket two years earlier. Id. ¶¶ 18–19. Plaintiff does not specify how many complaints there were overall, but asserts that Monroe eventually relied upon four of these complaints that were sent by email to overturn the Speech Committee's decision. Id. ¶ 20. These four email complaints inaccurately stated that Plaintiff had disseminated the Bracket himself and refused to apologize. Id. ¶ 21. The complaints said initial handling of the matter was insufficient and requested additional punishment in the form of excluding Plaintiff from speaking at the graduation ceremony. Id. ¶ 22.

In relying on these complaints and overruling the Speech Committee, Monroe did not investigate the details of the Bracket or Principal Doemel's 2018 resolution of the matter, and erroneously believed the Bracket "ranked photos" of female students. Id. ¶¶ 27–28. On June 4, 2020, Monroe officially ordered that Wang would not be allowed to speak at the graduation ceremony. The next day, Monroe assured one complaining parent that her decision was final, and Plaintiff would not speak. Id. ¶ 24. Plaintiff notes that the Speech Committee rules did not authorize Monroe or anyone else to overrule their selection. Id. ¶ 25.

Plaintiff was not informed of Monroe's decision until June 8, 2020, when he was told in person by Principal Doemel. Id. ¶ 35. Plaintiff contacted Monroe that same day and requested an opportunity to be heard, but Monroe would not speak with him until June 15, 2020. Id. ¶¶ 36–37.

3

During their discussion, Monroe told Plaintiff that some female classmates were upset by the Bracket and that permitting him to speak would be perceived as honoring him. Id. ¶ 39. She claimed Plaintiff's speech was objectionable because it could be perceived as providing advice, which might offend some of the female students, and that the statement in his book that boys would have reacted differently to a bracket created by girls "rubbed her the wrong way." Id. Monroe told Plaintiff it was "really late" to change her mind, and that he would have to change the perspectives of the offended students and their families if he wanted to be reinstated as speaker. Id. ¶ 40. Monroe did not inform Plaintiff of the nature of the complaints against him, what her understanding of the Bracket was, or that she had assured parents that her decision was final. Id. ¶ 41. Monroe refused to reinstate Plaintiff, but advised him to communicate in writing with the Board of Education ("Board") before their meeting two days later on June 17, 2020, "so it could consider her decision and his input." Id. ¶ 43.

On June 16, 2020, Plaintiff submitted a written appeal to the Board requesting they reverse Monroe's decision. Id. ¶ 44. Prior to or during the meeting on June 17, Monroe provided the Board with the four email complaints she had relied upon and excerpts from Plaintiff's book. Id. ¶ 45. Monroe did not provide the Board with a copy of Plaintiff's Resilience Speech. Id. ¶ 45. Monroe falsely described the Bracket as ranking photographs of classmates and falsely told the Board Plaintiff had never apologized for his actions. Id. ¶¶ 45–46. Monroe also falsely stated to the Board that she had never told Plaintiff it was "really late" for her to change her decision. Id. ¶ 46.

On June 18, 2020, the Board rejected Plaintiff's appeal, stating in an email that they had considered Plaintiff's letter during the meeting and chose to uphold Monroe's decision, but did not state their reasons for upholding the decision. Id. ¶ 47. When Plaintiff requested an

explanation and access to the minutes of the meeting, his request was denied. Id. ¶ 48. On June 20, Plaintiff, now through an attorney, sought reconsideration of the Board's decision on the grounds that their actions violated his rights to free speech, due process, and the requirements set forth in the District's Code of Conduct. Id. ¶ 49. The Board refused to reconsider. Id. ¶ 50.

On June 24, 2020, Plaintiff filed a petition with the Commissioner of Education appealing the Board's decision, asserting violation of his right to free speech, due process, and to be free from discrimination, and requesting a stay of the Board's decision so that Plaintiff's speech could be heard. Id. ¶ 51. The District opposed Plaintiff's request for a stay by filing a letter written by Monroe. Id. ¶ 52. The letter falsely described the Bracket, falsely stated the substance of Monroe's phone conversation with Plaintiff, asserted the Bracket was sexual harassment and that barring Plaintiff was necessary to protect female students from being victimized, and included the email complaints Monroe relied upon to make her decision. Id. ¶ 52.

This was the first time Plaintiff was made aware of Monroe's erroneous understanding and description of the Bracket and the content of the email complaints. Id. ¶ 53.

On June 25, 2020, the Commissioner denied Plaintiff's request for a stay, and the graduation ceremony took place the next day, on June 26, 2020. Id. ¶ 55. The ceremony featured a female Caucasian student who spoke in Plaintiff's place. Id. ¶¶ 55–56, 70.

Nearly a year later, on June 21, 2021, the Commissioner dismissed Plaintiff's appeal as moot given that the graduation ceremony had already occurred and the Commissioner could not grant meaningful relief. Id. ¶ 57. The Commissioner did, however, note that Defendants' "imposition of additional, punitive measures" years after a matter had been resolved "raise[d] substantial questions of fairness . . . and caution[ed] [Defendants] from taking similar action in the future." Id.

Plaintiff instituted this action on September 16, 2021. See Dkt. No. 1. Plaintiff's Complaint sets forth federal claims brought under 42 U.S.C. § 1983 ("Section 1983") for First Amendment Retaliation (Count I), violation of First Amendment rights (Count II), violation of Fourteenth Amendment substantive due process rights (Count III), violation of Fourteenth Amendment procedural due process rights (Count IV), violation of Title IX of the Education Amendments of 1972, 20 U.S.C § 1681, due to discrimination on the basis of sex in an educational program (Count V), and violation of Title VI of the Civil Rights Act, 42 U.S.C. § 2000d, due to discrimination on the basis of race or national origin (Count VI). Compl. at 20–24. Plaintiff also brings state law claims alleging violation of New York Human Rights Law and District policies and Code of Conduct (Count VII), breach of a contract created by the speech competition rules and procedures (Count VIII), violation of the District's express and common law due process standards (Count IX), and negligent infliction of emotional distress (Count X). Id. at 24–30.

Defendants move to dismiss the Complaint under Federal Rule of Civil Procedure ("FRCP") 12(b)(1) arguing that Plaintiff lacks standing to obtain the relief he requests, and thus the Court does not have subject matter jurisdiction. See Defs.' Mem at 3–5. Defendants also move for dismissal under FRCP 12(b)(6), arguing that (1) Plaintiff has not adequately pled the necessary factors under Monell v. Dept. of Social Services, 436 U.S. 658 (1978) to state a Section1983 claim against the District, (2) that Plaintiff's state law claims are barred due to Plaintiff's failure to timely serve a notice of claim as required by state law, and (3) that even if Plaintiff's claims are not barred under Monell or notice of claim requirements, Plaintiff has not pled facts sufficient to state a claim. Id. at 5–25.

## III.   LEGAL STANDARD

In evaluating a motion to dismiss made under Rule 12(b)(1) or (6), a court must accept as true "all material [factual] allegations of the complaint" and "draw[ ] all reasonable inferences in favor of the plaintiff."[1] Carter v. HealthPort Techs., LLC, 822 F.3d 47, 56–57 (2d Cir. 2016) (giving standard for Rule 12(b)(1)); Allaire Corp. v. Okumus, 433 F.3d 248, 249–50 (2d Cir. 2006) (same regarding Rule 12(b)(6)). "Nonetheless, conclusory allegations are not entitled to the assumption of truth." Francis v. Kings Park Manor, Inc., 992 F.3d 67, 72 (2d Cir. 2021).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). "[T]he pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Id. (citing Twombly, 550 U.S. at 555).

## IV.   DISCUSSION

Defendants argue that the Complaint should be dismissed because (A) Plaintiff does not have standing, (B) Plaintiff's claims are moot, (C) the Complaint does not establish municipal liability, (D) the Complaint does not establish Monroe's personal involvement, and (E) Plaintiff

---

[1] This is true for 12(b)(1) motions, at least where the attack on standing relies on the allegations in the complaint, rather than an introduction of extrinsic facts. Russo v. City of Hartford, 184 F. Supp. 2d 169, 178 (D. Conn. 2002) (explaining that, where a defendant proffers evidence beyond the pleadings in support of its Rule 12(b)(1) motion, "there is no presumptive truthfulness to the facts alleged in the complaint, and the court may consider evidentiary matter presented in an affidavit or otherwise in addition to the complaint." (citing Kamen v. AT&T Co., 791 F.2d 1006, 1011 (2d Cir. 1986)); see also See Katz v. Donna Karan Co. Store, L.L.C., 872 F.3d 114, 119 (2d Cir. 2017).

has not met the notice of claim requirements necessary to bring his state law claims. Defs.' Mem. at 3–11. In addition, Defendants argue the Complaint does not allege facts sufficient to state a claim for (F) First Amendment retaliation, (G) First Amendment viewpoint discrimination, (H) violation of Fourteenth Amendment substantive due process rights, (I) violation of Fourteenth Amendment procedural due process rights, (J) violation of Title IX, and (K) violation of Title VI. Id. at 11–23.

### A.  Rule 12(b)(1) Standing

Any party seeking to invoke the jurisdiction of a federal court to decide a case or controversy as contemplated in Article III of the Constitution must demonstrate standing. Hollingsworth v. Perry, 570 U.S. 693, 704 (2013). To establish standing, a plaintiff must show that (1) he has suffered a concrete and particularized "injury in fact" that is actual or imminent, rather than merely conjectural, (2) the injury is "fairly traceable to the challenged action of the defendant," and (3) the injury is "likely to be redressed by a favorable decision." Id. at 704 (citing Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992)). The party invoking jurisdiction bears the burden of establishing these elements and each "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." Lujan, 504 U.S. at 561. "[S]tanding is not dispensed in gross, and, accordingly, a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." Davis v. FEC, 554 U.S. 724, 734 (2008).

### 1. Concrete and Actual Injury in Fact

Plaintiff alleges in support of each of his claims that he suffered the following injuries: economic harm; Compl. ¶¶ 85, 88, 91, 94, 100, 104; prior and ongoing reputational damage; id.

¶¶ 77–81, 85, 88, 91, 94, 100, 104; emotional and psychological distress; id. ¶¶ 85, 88, 91, 94, 100, 104; and legal expenses; id. ¶ 82. In support of Counts I–VI, Plaintiff also alleges harm in the form of violations of his constitutional rights. Id. ¶¶ 83–104.

The Complaint does not allege any facts to support Plaintiff's assertion that he has suffered direct economic injuries as a result of Defendants' actions other than accumulation of attorney's fees.[2] Similarly, Plaintiff does not assert any facts supporting his claim of emotional and psychological distress, other than to conclusorily state that Plaintiff "sustained emotional, [and] psychological" injuries. Compl. ¶ 85. This is insufficient to confer standing. See Harry v. Total Gas & Power N. Am., Inc., 889 F.3d 104, 110 (2d Cir. 2018) (A plaintiff must "plead enough facts to make it plausible that they did indeed suffer the sort of injury that would entitle them to relief."); cf. Doe v. City of N.Y., No. 18-CV-670, 2018 WL 3824133, at *13 (E.D.N.Y. Aug. 9, 2018) (finding plaintiff sufficiently alleged concrete emotional and psychological harm because she "allege[d] that she suffered from 'fright, anguish, shock, nervousness, and anxiety' as a result of defendants' action).

However, the Court finds the facts alleged in the Complaint create a reasonable inference that Plaintiff suffered violations of certain constitutional rights, which will be discussed further in Sections IV(F)–(K) of this opinion. See TransUnion LLC v. Ramirez, 141 S.Ct. 2190, 2204 (2021) (finding that "concrete harms" sufficient to establish standing "include . . . harms

---

[2] However, the Court notes that New York State courts recognize standing for breach of contract claims even absent measurable economic damages.  37 E. 50th St. Corp. v. Rest. Grp. Mgmt. Serv., LLC, 2014 NY Slip Op 31595(U), ¶ 12 (Sup. Ct.) ("[H]arm is caused by the fact of one party's breaking its contractual promise to another, apart from any measurable form of damages."); see also Kronos, Inc. v. AVX Corp., 81 NY2d 90, 95, 612 N.E.2d 289, 595 N.Y.S.2d 931 (1993) ("Nominal damages are always available in breach of contract actions.").

specified by the Constitution itself" such as violation of free speech rights) (citing Spokeo, Inc. v. Robins, 578 U.S. 330, 340 (2016)).

The Court holds similarly regarding Plaintiff's claim of reputational harm, which is also a concrete injury sufficient to confer standing. See id. ("[C]oncrete harms" sufficient to establish standing "include, for example, reputational harms . . .") (citing Meese v. Keene, 481 U.S. 465, 473 (1987)). Plaintiff alleges that Defendants' decision to bar him from speaking "caused some classmates to believe [Plaintiff] had engaged in misconduct," and that as a result he was excluded from certain post-graduation activities. Compl. ¶ 78. Plaintiff further asserts that Defendants' actions led classmates to believe he "had not honored his commitments to Principal Doemel, [and] had not apologized for his 2018 errors" and that this resulted in "continued vilification and stigmatization." Id. ¶ 80–81. These allegations are sufficient to create a reasonable inference that Plaintiff suffered concrete reputational harm. See Bernheim v. Litt, 79 F.3d 318 (2d Cir. 1996) (finding "legally cognizable harm" in part due to plaintiff's claim that her reputation had been damaged by defendant's accusations of dishonesty).

### 2. Traceability of the Harm to the Challenged Actions of Defendants

At the pleading stage of litigation, a plaintiff's "burden . . . of alleging that their injury is fairly traceable to the challenged act 'is relatively modest,'" and is a standard lower than proximate cause. Rothstein v. UBS AG, 708 F.3d 82, 92 (2d Cir. 2013) (quoting Bennett v. Spear, 520 U.S. 154, 171 (1997)).

Here, Plaintiff's alleged injuries are "fairly traceable" to Defendants' challenged actions. Plaintiff alleges that he suffered reputational and constitutional injuries as a direct result of Defendants' decision to disinvite him from speaking at graduation and the process by which they

made that decision. See generally Compl. ¶¶ 83–125. Indeed, Defendants do not argue that the alleged injuries are not traceable to their alleged conduct. See generally Defs.' Mem.

### 3. Likelihood that Alleged Injuries will be Redressed by a Favorable Decision

Finally, these harms, if proven, are likely redressable by a favorable decision. It is well-settled that violations of constitutional rights may be remedied with money damages under Section 1983. Carey v. Piphus, 435 U.S. 247, 266 (1978) ("[T]he denial of procedural due process should be actionable for nominal damages without proof of actual injury Section 1983."). Beyah v. Coughlin, 789 F. 2d 986, 989 (2d Cir. 1986) ("[I]t is now well established that if [a plaintiff] can prove that he was deprived of a constitutionally protected right, . . . [he] will be entitled to recover at least nominal damages."). Further, reputational injury is adequately redressed by both money damages and declaratory relief. See Under Seal v. Under Seal, 273 F. Supp. 3d 460, 473 (S.D.N.Y. 2017) ("[R]eputational harm . . . is generally compensable with money damages."); Derrick Storms v. United States, No. 13-CV-811, 2015 WL 1196592, at *21 (E.D.N.Y. Mar. 16, 2015) (exercising discretion in deciding whether to grant declaratory relief to remedy reputational harm because "[f]ederal courts have 'unique and substantial discretion in deciding whether to declare the rights of litigants' under the Declaratory Judgment Act." (quoting Wilton v. Seven Falls Co., 515 U.S. 277, 286 (1995))).[3]

The Court thus finds Plaintiff has standing to bring each of his claims.

---

[3] Defendants argue the Complaint does not allege an "actual injury" because "courts have held that a school district's denial of a student's opportunity to participate in an assembly is, at most, a de minimus [sic] deprivation rather than an injury." Defs.' Mem. at 4. However, as the Court discusses in detail in Section IV(F)(2), the circumstances of this case are distinguishable from those present in the case cited by Defendants, Vetrano v. Miller Place Union Free School Dist., 369 F. Supp. 3d 462 (E.D.N.Y. 2019), and interpreting the allegations of the Complaint in the light most favorable to Plaintiff, the Court finds the harm to Plaintiff is more than de minimis.

### 4. Standing for Injunctive and Declaratory Relief

As stated above, a Plaintiff must establish standing, not only for each claim he brings, but also "for each form of relief that is sought." Davis, 554 U.S. at 734. Although the Court has decided that Plaintiff has alleged injuries sufficient to establish standing to bring each of his claims, it must determine whether Plaintiff has standing to request the declaratory[4] and injunctive[5] and declaratory relief requested in sections (a) through (n) of his prayer for relief. See Compl. at 30–32.

"A plaintiff seeking injunctive or declaratory relief cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he or she will be injured in the future." Deshawn E. by Charlotte E. v. Safir, 156 F.3d 340, 344 (2d Cir. 1998) (citing City of Los

---

[4] Plaintiff's claims for declaratory relief include a declaration that (a) the District's discipline of Plaintiff for his out-of-school speech violated Plaintiff's free speech rights under the First and Fourteenth Amendments, (b) that Defendants' actions constitute viewpoint discrimination in violation of the First and Fourteenth Amendments, (c) that Defendants' actions punishing Plaintiff violated his procedural due process rights under the Fourteenth Amendment, (d) that Defendants' actions punishing Plaintiff violated his substantive due process rights under the Fourteenth Amendment, (e) that Defendants' actions discriminated against Plaintiff in violation of Title IX, (f) that Defendants' actions discriminated against him in violation of Title VI of the Civil Rights Act, (g) that Defendants' actions discriminated against Plaintiff in violation of the Dignity For All Students Act, the District Code of Conduct, and District Policies, (h) that Defendants' violation Common Law Due Process requirements, state law, and the District's Code of Conduct, (i) that Defendants' actions breached Plaintiff's contract rights, (j) that Defendants' actions constituted negligent infliction of emotional distress. See Compl. at 30–32.

[5] Plaintiff's claims for injunctive relief include (k) reinstating the Speech Committee's selection of Plaintiff as a designated keynote speaker, annulling Defendants' revocation, and directing that Plaintiff's recorded speech be included with the other recordings or records for the Graduation Ceremony, (l) expunging school records regarding imposition of discipline on Plaintiff after June 2020, and redaction of all false email statement received by District regarding Plaintiff, (m) directing Defendants to inform the public that they will abide by the Constitutional free speech rights of students and that the District erred in revoking the Speech Committee's selection, and (n) ordering the District to implement the Dignity For All Students Act to minimize continuing discrimination to Wang and similarly situated students. See Compl. at 32.

Angeles v. Lyons, 461 U.S. 95, 105-06 (1983)). Defendants argue Plaintiff does not have

standing to pursue injunctive or declaratory relief because "Plaintiff has not and cannot possibly

allege that any of the alleged harms he suffered are likely to recur" given that he has graduated

and no longer attends a District school. Defs.' Mem. at 4. Plaintiff responds that the requests for

relief set forth in sections (a) through (m) of the Prayer for Relief "are necessary to correct the

record, to prevent future harm to Wang, [and] to clear his reputation." Resp. at 4 n.1.

Defendants are correct that when requesting prospective injunctive relief for a past,

discrete harm, a plaintiff must allege facts from which it may be inferred that the harm is likely

to recur. See Deshawn, 156 F.3d at 344. A plaintiff is not, however, required to demonstrate a

likelihood of future harm where he alleges not only past damage but *continuing* reputational

injury.[6] See Pungitore v. Barbera, 506 F. App'x 40, 41 (2d. Cir 2012) (to establish standing

---

[6] Defendants rely on the Second Circuit's summary order in Peck v. Baldwinsville Cent. School
Dist., 351 Fed. App'x 477 (2d Cir. 2009) to argue Plaintiff does not have standing because he
has not alleged both a likelihood of future harm and an official policy. Reply at 2. The Peck court
does state that, to have standing for injunctive relief, "the plaintiff 'must demonstrate both a
likelihood of future harm *and* the existence of an official policy or its equivalent.'" 351 Fed.
App'x at 479 (emphasis in original) (citing Shain v. Ellison, 356 F.3d 211, 216 (2d Cir. 2004);
Lyons, 461 U.S. at 105–06). However, an inspection of Peck and its progeny—Shain and
Lyons—reveals that this doctrine addresses situations where a state actor subjects a plaintiff to a
discrete, past harm, and the plaintiff now seeks prospective injunctive relief to prevent that harm
from happening again in a hypothetical future encounter. See Lyons, 461 U.S. at 105–06
(plaintiff alleging police illegally choked him during encounter and seeking injunctive relief to
prevent police from choking him again in hypothetical future encounter); Shain, 356 F.3d at 215
(alleging police performed unconstitutional strip search and seeking injunctive relief to prevent
future hypothetical unconstitutional searches).

This line of cases applies the general standard that a future injury must be "real and immediate"
rather than "conjectural or hypothetical," Shain, 356 F.3d at 215, and thus requires a plaintiff to
demonstrate that (1) the situation in which the harm arose is likely to recur, and (2) there is some
reason to believe that when that situation again arises, the harmful act will again be committed,
such as when a policy or custom directs the commission of such an act in the given situation. See
Lyons, 461 U.S. at 106 (requiring plaintiff to establish he was likely to have another encounter
with police and "(1) that all police officers in Los Angeles always choke any citizen with whom
they happen to have an encounter, … or, (2) that the City ordered or authorized police officers to

"when seeking prospective injunctive relief, the plaintiff must prove the likelihood of *future* or *continuing harm*." (emphasis original)); Storms, 2015 WL 1196592, at *23 ("The Court's authority to adjudicate claims for declaratory relief is discretionary" to remedy ongoing reputational injury. (quoting Wilton, 515 U.S. at 286)). The Complaint here alleges precisely this type of continuing reputational injury. See Compl. ¶ 81 ("The District's improper decisions and actions undermined and damaged Wang's reputation . . . resulting in continued vilification and stigmatization[.]"); Resp. at 4 ("Nothing indicates that Defendants have corrected Monroe's false statements or sought to eliminate or minimize continuing harm to Wang."). Plaintiff has thus established standing for the relief requested in sections (a) through (m) of his Prayer for relief— which deals with declarations that Defendants' actions were improper, expunging the records of Plaintiff's disciplines, and otherwise remedying the harm to his reputation, Compl. at 30–32— may reasonably remedy this alleged ongoing reputational harm.

The Court finds differently regarding section (n) of the Prayer for Relief. Here, Plaintiff requests that the Court order the District to "implement The Dignity For All Students Act to minimize the continuing District discrimination and harm to Wang and others similarly situated and to file applicable reports required by such law regarding the Defendants' unlawful discrimination against Wang." Id. at 32. Plaintiff claims this relief "is necessary to prevent harm

---

act in such manner."); Shain, 356 F.3d at 215–16 (requiring plaintiff to establish "the likelihood of a future encounter with the Nassau County police likely to result in a subsequent unconstitutional strip search"). This does not apply to cases, such as this, where a continuing harm is alleged. See Deshawn, 156 F.3d at 344 (granting standing for injunctive relief in part because "unlike Lyons, the plaintiffs in this case allegedly continue to suffer harm from the challenged conduct"); Marisol A. by Forbes v. Giuliani, No. 95-CV-10533, 1998 WL 274472, at *8 n.4 (S.D.N.Y. May 26, 1998) (distinguishing from Lyons and granting standing for injunctive relief where "plaintiffs were still alleging harm" from government's actions); see also O'Shea v. Littleton, 414 U.S. 488, 495–96 (1974) ("[P]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects").

to Wang and similarly situated District students." Resp. at 4 n.1. The Complaint does not contain any allegations of specific continuing or future discriminatory acts against Wang perpetrated by the District. Further, given that Plaintiff no longer attends a District school and has not alleged any interaction with the District beyond this litigation, the Complaint does not contain allegations from which the Court could reasonably infer a future, recurring, or continuing harm to Wang that would be addressed by this relief. Plaintiff also does not have standing to request relief on behalf of other students who are not parties to this litigation, regardless of whether they are "similarly situated." See Lujan, 504 U.S. at 560–61 (1992) ("[T]he irreducible constitutional minimum of standing is [in part] that . . . the injury must affect the plaintiff in a personal and individual way."); Kiryas Joel All. v. Vill. of Kiryas Joel, 495 F. App'x 183, 189 (2d Cir. 2012) (upholding dismissal of claims made on behalf of non-parties due to lack of standing because "the rights [§ 1983] secures [are] personal to those purportedly injured" (quoting Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011)).

Thus, the Court finds Plaintiff does not have standing to request the relief set forth in section (n) of his Prayer for Relief.

### B.  Mootness

Defendants argue that Plaintiff's claims for declaratory relief are moot because Plaintiff has graduated. Reply at 2–3; Defs.' Mem. at 3.

The mootness doctrine, mandated by the Article III "case or controversy" requirement, forbids federal courts from adjudicating matters "that no longer present an actual dispute between parties." Catanzano v. Wing, 277 F.3d 99, 107 (2d Cir. 2001). Thus, courts may not entertain any federal action "when the question sought to be adjudicated has been mooted by

subsequent developments." <u>Velvet Underground v. Andy Warhol Found. for the Visual Arts, Inc.</u>, 890 F. Supp. 2d 398, 403 (S.D.N.Y. 2012) (citation omitted).

An issue is moot "if the defendant can demonstrate that (1) there is no reasonable expectation that the alleged violation will recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." <u>NextG Networks of NY, Inc. v. City of New York</u>, 513 F.3d 49, 54 (2d Cir. 2008) (citing <u>Granite State Outdoor Adver., Inc. v. Town of Orange, Conn.</u>, 303 F.3d 450, 451 (2d Cir. 2002)).

Defendants have failed to establish the second prong of the mootness test. As stated above, the Complaint alleges, not only past infringement on constitutional and federal statutory rights, but present and ongoing reputational harm. <u>See e.g.</u>, Compl. ¶ 81 ("The District's improper decisions and actions . . . result[ed] in continued vilification and stigmatization of Wang."). Accordingly, Defendants have not demonstrated that "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation[,]" and the issue is not moot. <u>See</u> <u>Storms</u>, 2015 WL 1196592, at *22 (finding claim not moot in part because the defendants' actions "continue[d] to destroy Plaintiffs' reputations . . .") (quoting <u>Clear Channel Outdoor, Inc. v. City of New York</u>, 594 F.3d 94, 110 (2d Cir. 2010)).

### C.  Municipal Liability Against the District Under Rule 12(b)(6)

Plaintiff attempts to establish municipal liability against the District under <u>Monell v. Dep't of Soc. Services</u>, 436 U.S. 658 (1978). Plaintiff argues the District deprived him of his constitutional rights, first through the actions of Superintendent Monroe when she initially decided to remove Plaintiff as graduation speaker, failed to investigate the complaints made against him, and provided false information to the Board of Education, Compl. ¶¶ 23, 27, 45, and

then through the Board of Education when they "ratified and approved Monroe's decision and actions," id. ¶ 47.

"Municipal entities, including school districts, are 'persons' within the meaning of §1983 and therefore subject to suit under that provision." Kimble v. Kingston City School Dist., 792 Fed. App'x 80, 81 (2d Cir. 2019) (citing Nagle v. Marron, 663 F.3d 100, 116 (2d Cir. 2011)). To establish Monell liability against a municipal entity under Section 1983, a plaintiff must show "(1) a municipal policy or custom that (2) causes the plaintiff to be subjected to (3) the deprivation of a constitutional right." Agosto v. N.Y.C. Dep't of Educ., 982 F.3d 86, 97 (2d Cir. 2020).

A plaintiff may establish the first Monell prong—existence of policy or custom—against a school district by establishing one of the following: (A) "that a district employee was acting pursuant to an expressly adopted official policy;" (B) "that a district employee was acting pursuant to a longstanding practice or custom;" or (C) that "an official with final policymaking authority took action regarding, or made the specific decision with respect to" the adverse action. Kimble, 792 Fed. App'x at 81 (quoting Hurdle v. Bd. of Educ., 113 F. App'x 423, 424–25 (2d Cir. 2004)).

When it is alleged under prong (1)(C) that the violative action or decision was made by a final policymaker, a municipality may be liable "for [even] a single decision." Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986). Further, whether a particular official possessed final policymaking authority is a legal question that must be answered based on state law and resolved by the court. Agosto, 982 F.3d at 97. To have final policymaking authority, the official in question

> "with respect to the conduct challenged, [] must be 'responsible under state law for making policy *in that area* of the [municipality's] business' or must 'have the

power to make official policy *on a particular issue*,' or must 'possess[] final authority to establish municipal policy *with respect to the action ordered*.'"

Hurdle, 113 Fed. App'x at 425 (emphasis in original) (citations omitted) (quoting Jeffes v. Barnes, 208 F.3d 49, 57 (2d Cir. 2000)). In sum, the Court should search through "state and local positive law, as well as custom or usage having the force of law," Jeffes, 208 F.3d at 57 (2d Cir. 2000), to determine who has "authority to adopt rules for the conduct of government" with respect to the area of conduct at issue, Hurdle, 113 Fed. App'x at 427.

Finally, where an official with policymaking authority approves a subordinate's decision and the basis for it, this ratification is chargeable to the municipality as a decision by one with final policymaking authority. City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988).

Defendants argue, and the Court agrees, that Plaintiff has not alleged the existence of an official policy or a longstanding custom sufficient to meet prongs (A) or (B) of Kimble.[7] Thus, to establish Monell liability, Plaintiff must have alleged under Kimble prong (C) that the allegedly violative actions were committed by officials with final policymaking authority in the particular area of the municipality's business related to the actions. See Jeffes, 208 F.3d at 57 (where a plaintiff does not allege actions were taken pursuant to a policy or custom, "but rather that they were taken or caused by an official whose actions represent official policy, the court must

---

[7] Plaintiff argues that a policy "to prevent girls and/or their parents from being upset at a final graduation ceremony by blocking from speaking 1) a student who had previously created a writing or done something that upset girls or their parents; or 2) or a student who Monroe deemed 'unsuitable' due to his prior writings or the substance, tone, or implied message of him or his planned speech" may be "discerned" from Monroe's statements. Resp. at 6. However, this description is contained entirely in Plaintiff's Response. The Complaint contains no allegations regarding the existence of a formal policy or custom, and likewise does not contain any allegations of other similar instances that could raise an inference that Defendants maintain a relevant policy or custom. See Murray v. Admin. for Children's Servs., 476 F. Supp. 2d 436, 442 (S.D.N.Y. 2007), aff'd, 293 F. App'x 831 (2d Cir. 2008) ("The Amended Complaint does not allege other similar instances . . . that could raise an inference that [defendant] maintains a policy or custom of deliberate indifference to these types of constitutional deprivations.").

determine whether that official had final policymaking authority in the particular area involved.").

This raises two additional issues. The Court must determined, first, the appropriate "area" of the municipality's business at issue, and second, whether the relevant actors here, Monroe and the Board of Education, had final policymaking authority in that area.

### 1. Appropriate Area of the Municipality's Business

In most disputes, the area of the municipality's business at issue is readily apparent and need not be directly analyzed by a court. See, e.g., Hurdle, 113 Fed. App'x at 426 (dealing with authority to transfer employees); Kimble, 792 Fed. App'x at 82 (dealing with hiring authority); Konits v. Valley Stream Cent. High Sch. Dist., No. 01-CV-6763, 2006 WL 224188, at *5 (E.D.N.Y 2006) (dealing with hiring authority). In other cases, such as this, the question is more nuanced. See, e.g., Jeffes, 208 F.3d 49, 57 (where plaintiff alleged First Amendment retaliation due to "code of silence" at county jail, finding correct policymaking "area" to be "the duties and obligations of the sheriff's staff members toward each other with respect to their exercise of First Amendment rights" and not generally "'personnel' and 'employment'" matters as district court had determined).

Here, Defendants appear to argue that the relevant policymaking area is policy regarding the selection of graduation ceremony speakers. Defs.' Mem. at 6. Defendants argue Plaintiff cannot establish that either Monroe or the Board are final policymakers because the Complaint alleges "no 'other person' had the authority to 'reject or overrule the Speech Committee's selections." Id. (citing Compl. ¶ 25); see also Reply at 3.

Even assuming Defendants have correctly identified "selection of graduation speakers" as the correct area of policymaking authority, there are two problems with this argument. First, it is

evident that, whether Monroe and the Board officially given authority to overrule the Selection

Committee or not, they *did* in reality overrule them, and thus had power to do so. Compl. ¶¶ 20,

47. Accordingly, it seems unlikely that the Committee was the final decisionmaker in practice.

Second, even if the Committee was the final decisionmaker on this issue, there is a meaningful

distinction between a final *decisionmaker* and a final *policymaker*. See Agosto, 982 F.3d at 98

("It is not enough that an official had discretion to make a decision that was unreviewable . . .

[rather, he must be] responsible under state law for making policy in that area of the

municipality's business" (citing Anthony v. City of New York, 339 F.3d 129, 139 (2d Cir.

2003)); Hurdle, 113 Fed. App'x at 427 ("That a particular agent is the apex of a bureaucracy

makes the decision 'final' but does not forge a link between 'finality' and 'policy.'"). Regardless

of whether Monroe and the Board had official authority to review and overrule the Committee,

and therefore may not have been final decisionmakers, they could still be considered final

policymakers.

　　However, Defendants' argument suffers from a broader problem. As Defendants state

multiple times, their actions were not done in the course of simply choosing a speaker for a

graduation ceremony, but rather in response to Plaintiffs' past actions and complaints received

regarding those actions. Defs.' Mem. at 8, 9, 14, 15, 16. Thus, according to the allegations in the

Complaint, Monroe and the Board's actions are more accurately described as punitive.

Defendants were attempting to remedy a past wrong committed by a student, as they saw it, and

intended to deal with conduct they believed endangered the morals or welfare of other students.

Id. at 14 ("Defendants believed that 'the bracket was sexual harassment and that barring

[Plaintiff] from speaking was needed to protect females from being victimized.'"). Indeed, even

the Commissioner described their actions as a "punitive measure in connection with a two-year

20

old disciplinary incident." Compl. ¶ 57. The specific policymaking area at issue is then more accurately described as punishment of students and regulation of student behavior.

### 2. Defendants' Final Policymaking Authority

The Court thus reaches the second issue: whether Monroe or the Board had final policymaking authority regarding disciplining students or remedying past behavior, such that their actions constitute a municipal policy, thereby allowing the School District to be held liable under Monell?

The Court finds that Monroe, as Superintendent of the School District, cannot be considered a final policymaker regarding disciplinary matters. New York law grants superintendents the power to enforce provisions of law and "all rules and regulations relating to the management of the schools" but not to create rules or policies of their own. N.Y. Educ. Law § 1711(1)(b); see also Port Washington Teachers' Ass'n v. Bd. of Educ. of Port Washington Union Free Sch. District, 478 F.3d 494, 500–501 (2d Cir. 2007). The Superintendent may speak on all matters before the Board but has no vote on Board decisions. Id. § 1711(1)(a). The Superintendent is also "under the direction of the board of education." N.Y. Educ. Law. 1711(3). Because the Superintendent does not have authority to create policy regarding student discipline and punishment, and acts under the direction of the Board, the Court finds Monroe is not a final policymaker for the purposes of Plaintiff's claims. See Jones v. Bay Shore Union Free Sch. Dist., 170 F. Supp. 3d 420, 438 (E.D.N.Y.) (holding that superintendent is not final policymaker regarding regulation of conduct on district property) aff'd, 666 F. App'x 92 (2d Cir. 2016).

The Court reaches a different conclusion regarding the Board of Education. New York Education Law § 1709(2) grants boards of education the power "[t]o establish such rules and regulations [as shall seem proper] concerning the order and discipline of the schools." The

authority granted under § 1709 includes authority to enact policies to discipline students for misbehavior or acts that endanger the morals or welfare of others, even where such behavior occurs off campus. See Hunt v. Wilson, 72 Misc. 2d 360, 363–64 (N.Y. Sup. Ct. 1972) (finding that § 1709 grants a school board authority to establish rules and regulations "concerning the order and discipline of the schools" and thus gives authority to "deal with pupils whose conduct may endanger the safety, morals, health or welfare of others."); Appeal of T.W. and P.K., 2006 NY Educ. Dept. LEXIS 134 at *5–6 (N.Y. St. Educ. Dep't September 26, 2006) (stating that a board's authority to impose discipline extends to "events which occur off school property"). The Court "would not be justified in assuming that municipal policymaking authority lies somewhere other than where the applicable law purports to put it." Praprotnik, 485 U.S. 112 at 126.

Thus, while Superintendent Monroe is not a final policymaker regarding the punitive actions and process that Plaintiff complains of, the Board is. See T.E. v. Pine Bush Cent. Sch. Dist., 58 F. Supp. 3d 332, 372–73 (S.D.N.Y. 2014) (finding principal and superintendent not final policymakers because the boards of education have rule-making authority to handle order and discipline of schools under § 1709); Bay Shore, 170 F. Supp. 3d at 438 (E.D.N.Y.) ("[W]hile a Superintendent may be a decision-maker, the Board of Education is the final policymaker" regarding regulation of conduct on district property, due to authority given board in N.Y. Educ Law §§ 1708–1709).

Further, the Complaint alleges the Board directly took actions that violated Plaintiff's rights by rescinding his invitation to speak, determining the process by which the decision was made, and providing allegedly false information to the Commissioner to oppose Plaintiff's stay, Compl. ¶¶ 47–52, and also purportedly ratified Monroe's decision and the basis for it, which in themselves violated Plaintiff's rights, Compl. ¶47; see also Praprotnik, 485 U.S. 112, 127 ("If the

authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final").

Returning briefly to the overarching standard, it is not disputed that Plaintiff has sufficiently alleged that Defendants' action caused the asserted constitutional violations, and thus has met the second and third prongs of <u>Monell</u>. The Court will discuss further below whether Plaintiff has alleged facts sufficient to establish the respective constitutional violations, but for now the Court finds Plaintiff has alleged sufficient facts to establish <u>Monell</u> liability against the District. Accordingly, the Court denies Defendants' motion to dismiss on <u>Monell</u> grounds.

### D. Personal Involvement

Defendants contend Plaintiff has not established that Monroe[8] was personally involved in the alleged constitutional violations as required by <u>Tangreti v. Bachmann</u>, 983 F.3d 609, 618 (2d Cir. 2020).[9] Defendants' argue that "Plaintiff has failed to adequately plead underlying constitutional violations against the District or Superintendent Monroe, and thus cannot establish any of the elements of these claims against Superintendent Monroe directly." Defs.' Mem. at 8.

---

[8] To the extent Defendants make the argument that Monroe is entitled to qualified immunity, the Court declines to address this argument as it is made entirely in a footnote. See <u>Diesel v. Town of Lewisboro</u>, 232 F.3d 92, 110 (2d Cir. 2000) ("We do not consider an argument mentioned only in a footnote to be adequately raised or preserved for appellate review."); <u>Marino v. Coach, Inc.</u>, 264 F. Supp. 3d 558, 571 n.11 (S.D.N.Y. 2017) ("The Court will not consider arguments raised entirely by footnote."). This is especially appropriate given that Defendants have used footnotes extensively in their brief to present arguments, see Defs.' Mem. at 9, 11, 21, 23, possibly to circumvent the page limitations imposed by the local rules. L. R. 10.1(a)(5) ("[E]xtensive footnotes must not be used to circumvent page limitations.").

[9] To the extent Defendants argue that Monroe is entitled to qualified immunity, the court declines to address this argument as it is made entirely in a footnote. See <u>Marino v. Coach, Inc.</u>, 264 F. Supp. 3d 558, 571 n.11 (S.D.N.Y. 2017) ("The Court will not consider arguments raised entirely by footnote."). This is especially appropriate given that Defendants have used footnotes extensively in their brief to present arguments, see Defs.' Mem. at 9, 11, 21, 23, possibly to circumvent the page limitations imposed by the local rules, L. R. 10.1(a)(5) ("[E]xtensive footnotes must not be used to circumvent page limitations.").

Because Defendants merely argue Plaintiff has not adequately pled federal claims, their personal involvement argument merges with their Rule 12(b)(6) arguments and will be addressed in the respective sections below that discuss whether Plaintiff has adequately pled his federal law claims. See infra Sections IV(F)–(L).

### E.  Notice of Claim Requirements for State Law Claims

State notice of claim requirements are substantive law that must be applied by federal courts in deciding pendent state law claims. Felder v. Casey, 487 U.S. 131, 151 (1988); Promisel v. First American Artificial Flowers, 943 F.2d 251 (2d Cir.1991) ("If a state would not recognize a plaintiff's right to bring a state claim in state court, a federal court . . . [must] not allow that claim to be appended to a federal law claim in federal court.").

New York Education Law § 3813(1) ("Section 3813") mandates that:

> No . . . claim against the district . . . shall be prosecuted or maintained against any school district, board of education, . . . or any officer of a school district, board of education, . . . unless it shall appear by and as an allegation in the complaint . . . that a written verified claim upon which such action or special proceeding is founded was presented to the governing body of said district or school within three months after the accrual of such claim, and that the officer or body having the power to adjust or pay said claim has neglected or refused to make an adjustment or payment thereof for thirty days after such presentment.

Section 3813(2) sets out one exception, requiring actions "founded upon tort" against a party named in § 3813(1) to instead comply with the notice of claim requirements set forth in New York General Municipal Law § 50-i ("Section 50-i"), which in turn incorporates the requirements of General Municipal Law § 50-e ("Section 50-e"). See Amorosi v. S. Colonie Ind. Cent. School Dist., 9 N.Y.3d 367, 370 (N.Y. 2007) ("Tort claims against a school district are excepted from [Section 3813's] notice requirements, and must comply with the notice requirements found in General Municipal Law § 50-e.").

The requirements in Sections 50-i and 50-e are similar to those found in Section 3813(1). These two sections mandate that a verified notice of claim be served "on the public corporation against which the claim is made" by personal delivery, certified mail, or electronically if the public corporation pertains to a city with a population over one million. Section 50-e(1)–(3). It also must "appear by and as an allegation in the complaint or moving papers that at least thirty days have elapsed since the service of such notice." Section 50-i(1).

New York's notice of claim requirements are strictly interpreted by New York courts, and no variation is tolerated. See Santiago v. Newburgh Enlarged City Sch. Dist., 434 F. Supp. 2d 193, 196 n.2 (S.D.N.Y. 2006) (holding that, regarding notice of claim requirements, "[t]he New York Court of Appeals has clearly stated that no variation from the law's requirement will be countenanced."); Parochial Bus Sys., Inc. v. Bd. of Educ., 60 N.Y.2d 539, 548 (1983) ("[W]here the 'legislature has said that a particular form of notice, conveyed with particular details to particular public officers, shall be a prerequisite to the right to sue [,] [the] courts are without power to substitute something else.'") (quoting Thomann v. Rochester, 256 N.Y. 165, 172 (1931)).

Plaintiff's state law claims comprise claims for discrimination in violation of New York Human Rights Law, breach of contract, violation of common law due process, and negligent infliction of emotional distress. Compl. ¶¶ 105–25. Each of these claims is subject to either the notice of claim requirements in Section 3813 or Sections 50-i, and 50-e. Lewinter v. New York City Dept. of Educ., 2010 WL 2746334, at *2 (S.D.N.Y. 2010) ("The Legislature has spoken unequivocally that no action or proceeding may be prosecuted or maintained against any school

district or board of education unless a notice of claim has been presented to the governing body.").[10]

Plaintiff argues he met the notice requirements by filing various documents with the Commissioner of Education. Resp. at 8–9. But it is not sufficient that Plaintiff now attempts to factually establish that he met the notice requirements; rather, he must have pled in the Complaint that he did so. Santiago, 434 F. Supp. 2d at 196 ("The Education Law requires that it appear from the face of the complaint that the plaintiff filed a timely notice of claim."); Dodson v. Bd. of Educ. of the Val. Stream Union Free School Dist., 44 F. Supp. 3d 240, 250 (E.D.N.Y. 2014) ("Under New York General Municipal Law § 50-e, a plaintiff must, inter alia, serve a notice of claim within ninety days after the claim arises and plead that it has been served." (emphasis in original)).

The Complaint does not explicitly allege that Plaintiff served a "notice of claim" in any form. See generally Compl. It does briefly discuss the verified petition Plaintiff filed with the Commissioner of Education as part of his appeal, with a copy "emailed to the District." Compl. ¶ 51.

The Court finds these allegations in the Complaint, on their own, are insufficient to meet the requirements of either Section 3813 or 50-i and 50-e. There are no allegations from which it appears the petition was verified as required by Sections 3813(1) and 50-i, that it was served

---

[10] See also Amorosi, 9 N.Y.3d at 373 (applying Section 3813 to claims of discrimination under New York Human Rights Law); Consol. Const. Group, LLC v. Bethpage Union Free School Dist., 835 N.Y.S.2d 630, 634 (N.Y. App. Div. 2007) (Section 3813 applied to breach of contract); Felmine v. City of New York, 2012 WL 1999863, at *7 (E.D.N.Y. 2012) (state constitutional torts subject to Section 50-e requirements); Heim v. Dougherty, No. 19-CV-01160, 2020 WL 5659440 at *7 (W.D.N.Y. 2020) (claim for negligent infliction of emotional distress subject to Section 50-e).

specifically on the Board of Education as required by Section 3813(1),[11] or that it was served in a

form acceptable under Section 50-e(3): by personal delivery, certified mail, or, if the public

corporation pertains to certain cities, "by electronic means in a form and manner prescribed by

such city."

Plaintiff, however, implores the Court to look beyond the Complaint and consider the

contents of three documents that he attaches to his Response: a declaration submitted by his

attorney, Dkt. No 17-1 ("Sweeney Declaration"), the verified petition he sent to the

Commissioner of Education on June 24, 2020, Dkt. 17-2 ("Wang Petition"), and the supporting

affidavit dated August 10, 2020, which was also served as part of Plaintiff's appeal to the

Commissioner, Dkt. 17-3 ("Wang Affidavit"). Resp. at 2, 9. Plaintiff asserts these documents

establish that he has complied with the New York State notice requirements. Id.

Before determining whether these documents indeed establish that Plaintiff served a valid

notice of claim, the Court must first determine if it can take the contents of these documents into

account at this stage of litigation.

### 1. Consideration of Verified Petition, Affidavit, and Attorney Declaration

A court adjudicating a 12(b)(6) motion to dismiss may only review a narrow set of

materials.[12] Generally, courts may not look beyond "facts stated on the face of the complaint, . . .

---

[11] See Parochial, 60 N.Y.2d at 548 ("[Plaintiff's] failure to present its notice of claim 'to the
governing body of [the] district or school', here the defendant Board, as required by the clear
language of subdivision 1 of section 3813 of the Education Law, is a fatal defect mandating
dismissal of this action."); Santiago v, 434 F. Supp. 2d at 196 n.2 (same).

[12] The text of both Section 3813 and 50-i states that compliance with the notice requirements
must "appear by and as an allegation in the complaint." Section 3813(1); Section 50-i(1). It is not
clear that this requirement is coextensive with federal standards for what documents may be
considered on a Rule 12(b)(6) motion to dismiss. In other words, while a court may generally
examine documents attached to a complaint or incorporated by reference at the motion to dismiss
stage, the New York state law requirement that notice of claim compliance appear "as an

documents appended to the complaint or incorporated in the complaint by reference, and  . . .

matters of which judicial notice may be taken." Goel v. Bunge, Ltd., 820 F.3d 554, 558 (2d Cir.

2016) (quoting Concord Assocs., L.P. v. Entm't Props. Tr., 817 F.3d 46, 51 n.2 (2d Cir. 2016)).

In some cases, a document that is neither attached nor incorporated by reference may still be

considered on a motion to dismiss where it is "integral" to the complaint. Id. at 559.

It is undisputed that none of the documents Plaintiff now produces were appended to the

Complaint or are documents of which the court may take judicial notice. Thus, the Court must

determine if the documents are integral to the Complaint or incorporated therein by reference.

A document is integral "where the complaint relies heavily upon its terms and effect."

Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002). Generally, an integral

document is "a contract or other legal document containing obligations upon which the

plaintiff's complaint stands or falls" but which was not attached to the complaint. Goel, 820 F.3d

at 559.

Incorporation by reference requires more than merely referencing a document; even

quoting from a document in limited form does not render the document incorporated. Cosmas v.

Hassett, 886 F.2d 8, 13 (2d Cir. 1989) ("Limited quotation does not constitute incorporation by

reference.") (quoting Goldman v. Belden, 754 F.2d 1059, 1066 (2d Cir. 1985)) (additional

citations omitted); United States v. Int'l Longshoremen's Ass'n, 518 F. Supp. 2d 422, 452

(E.D.N.Y. 2007) ("[A]n extraneous document is not incorporated by reference into the complaint

where [t]he amended complaint merely discussed these documents and presented short

_____

allegation in the complaint" could potentially be narrower, and require the allegations appear in
the complaint itself and not in an external document. However, this is not addressed by the
parties. Because Plaintiff has not established compliance with the notice requirements even
under the broader 12(b)(6) interpretation, the court will assume *arguendo* that the two
requirements are coextensive.

quotations from them.") (citation omitted). The line between incorporating by reference and not

doing so is fine, and, when the document is merely referenced or quoted, the determination

"depends on the extent to which it is relied upon and made use of in the Complaint." Kassover v.

Essence Partners, No. 04-CV-5505, 2007 WL 9672541, at *3 (E.D.N.Y. Mar. 31, 2007) (citing

Kas v. Chase Manhattan Bank, N,A,, No. 90-CV-44, 1990 WL 113185, at *3 n.2 (S.D.N.Y. July

30, 1990)).

### a.  Sweeney Declaration

It is well-settled that a court may not consider factual averments contained in an

attorney's declaration at the motion to dismiss stage. Fair Hous. Justice Ctr. Inc. v. Lighthouse

Living LLC, No. 20-CV-4066, 2021 WL 4267695, at *3 (S.D.N.Y. Sep. 20, 2021) (citing

Amadei v. Nielsen, 348 F. Supp. 3d 145, 155 (E.D.N.Y. 2018)). Accordingly, the Court will not

consider the factual assertions made by Plaintiff's attorney in the Sweeney Declaration.

### b.  Wang Affidavit

The Court does not find the Wang Affidavit integral or incorporated by reference. The

Complaint does not so much as mention the Wang Affidavit, and thus it cannot be said the

Complaint relies "heavily" upon the affidavit's terms and effect. See Chambers v. Time Warner,

Inc., 282 F.3d 147, 154 (2d Cir.2002) (finding document not integral in part because "[t]he

Amended Complaint does not refer to the [it]"); Yang Zhao v. Keuka Coll., 264 F. Supp. 3d 482

(W.D.N.Y. 2017) (finding document not integral where "the amended complaint makes no

mention of [it]"). Additionally, a document that is not referenced could clearly not be said to be

incorporated by reference.

### c.  Wang Petition

As noted above, the Complaint does briefly refer to the Wang Petition:

> To pursue his N.Y. administrative appeal rights and remedies, Wang filed a Petition with the Commissioner of Education by email on June 24, 2020 (with copy emailed to the District) and by direct delivery on June 25, 2020 that appealed the District's decisions and exclusionary actions, asserting that the District had violated Wang's rights to freedom of speech, to due process of law, and to be free from illegal discrimination, and sought a stay to allow Wang's recorded speech to be heard at the graduation ceremony.

Compl. ¶ 51. The Complaint's only other reference to the Wang Petition is to state it was dismissed by the Commissioner. Id. ¶ 57.

The Court does not find that this mention in a single paragraph allows for a reasonable inference that the Complaint relies "heavily" on the Wang Petition's terms and effects. Plaintiff merely references a document from a separate proceeding. The terms and content of that document do not form the basis upon which Plaintiff's claims will stand or fall, such that the document is "integral" to the Complaint. Compare Goel, 820 F.3d at 560 (finding document from separate, related case not integral to complaint because complaint could not be said to "heavily rely on the terms and effect of [the] testimony."); with Optionality Consulting Pte. Ltd. v. Nekos, No. 18-CV-5393, 2019 WL 4523469, at *6 (S.D.N.Y. Sep. 18, 2019) (finding written draft agreement integral where it was a written version of the oral agreement upon which plaintiff's claims were based); and Cruz v. United Auto. Workers Union Local 2300, No. 18-CV-0048, 2019 WL 3239843, at *15 (N.D.N.Y. July 18, 2019) (finding collective bargaining agreement and union constitution integral because plaintiff's claim relied heavily on their terms and effects of the documents).

Neither does the Court find the Wang Petition is incorporated by reference. As stated above, merely referencing a document, even quoting from it in limited form, does not render the document incorporated. Cosmas, 886 F.2d at 13. A determination, "depends on the extent to which it is relied upon and made use of in the Complaint." Kassover v. Essence Partners, No. 04-CV-5505, 2007 WL 9672541, at *3 (E.D.N.Y. Mar. 31, 2007) (citing Kas v. Chase Manhattan

Bank, N.A., No. 90-CV-44, 1990 WL 113185, at *3 n.2 (S.D.N.Y. July 30, 1990)). Here, the

Court finds the scant references to the Petition, merely informing the Court of the fact of its

filing in a separate proceeding, are insufficient to render it incorporated by reference. Compare

Cosmas, 886 F.2d at 13 (finding documents not incorporated by reference where complaint

"merely discussed these documents and presented short quotations from them.") with Holloway

v. King, 161 F. App'x 122, 124 (2d Cir. 2005) (finding document incorporated where the

complaint was "replete" with references to it.).

> ### 2. Even if the Wang Petition is Considered, Plaintiff has not Pled Compliance with New York Notice of Claim Requirements

Further, even if the Court were to construe the Wang Petition as incorporated by

reference, Plaintiff would still not have sufficiently pled conformance with the requirements of

either Section 3813 or 50-e. While the Wang Petition is verified, it does not establish that service

was effected upon the Board of Education as required by Section 3813, or in a manner

acceptable under 50-e(3).

Again, New York Courts apply the requirements of the notice of claim laws strictly, even

if the results are harsh. See Varsity Tr., Inc. v. Bd. Of Educ. Of City of New York, 5 N.Y.3d 532,

536 (2005) ("We have repeatedly rejected, and now reject again, proposals to compromise the

strict statutory notice of claim requirement, because to do so would lead to uncertainty and

vexing disputes."); Parochial, 60 N.Y.2d at 548 ("Nor may a claimant be relieved of a positive

statutory mandate simply because no prejudice has resulted, even to avoid a harsh result."). Thus,

the Court finds that Plaintiff has not pled compliance with New York State notice of claim

requirements and Plaintiff's state law claims must be dismissed. Lewinter, 2010 WL 2746334, at

*2 ("[F]ailure to plead compliance with New York's notice of claim requirements mandates dismissal").[13]

### F.  First Amendment Retaliation

The Court notes at the outset of its analysis of Plaintiff's First Amendment claims that the facts presented in this case are unique. First Amendment cases brought in the scholastic context usually deal either with school officials punishing past speech, see, e.g., Mahanoy Area Sch. Dist. v. B.L., 141 S. Ct. 2038, 2043 (2021) (removing student from cheerleading squad after she criticized school and team); Cox, 654 F.3d at 272 (suspending student for writing essay describing how he would commit suicide in front of friends), or school officials censoring or preventing future speech, see, e.g., A.M. ex rel. McKay v. Taconic Hills Cent. School Dist., 510 Fed. App'x 3, 6 (2d Cir. 2013) (forcing student to remove sentence from graduation speech that was deemed "too religious"); Peck v. Baldwinsville Cent. School Dist., 426 F. 3d. 617, 622 (2d Cir. 2005) (preventing student from displaying poster containing religious imagery at assembly). Here, by contrast, there are two relevant sets of speech: the speech embodied in the Bracket and Plaintiff's book, and the speech Plaintiff intended to give at the graduation ceremony. The motivation and intent of defendant government officials is key to inquiries regarding First Amendment violations. The existence of these two, separate instances of speech potentially adds a layer of complexity to that inquiry.

Plaintiff's first speech-related claim alleges that Defendants retaliated against him due to the first set of speech, contained in the Bracket and book. See Compl. ¶¶ 83–85. To succeed on a claim of First Amendment retaliation, a plaintiff must establish that: "(1) his speech or conduct

---

[13] Because the Court dismisses Plaintiff's state law claims due to his failure to file a notice of claim, the Court will not rule on Defendants' arguments that the Complaint did not allege sufficient facts to support these claims. See Defs.' Mem. at 23–25.

was protected by the First Amendment; (2) the defendant took an adverse action against him; and

(3) there was a causal connection between this adverse action and the protected speech." Cox v.

Warwick Val. Cent. School Dist., 654 F.3d 267, 272 (2d Cir. 2011) (citing Scott v. Coughlin,

344 F.3d 282, 287 (2d Cir. 2003)).

### 1. Protected Speech

"[S]tudents do not 'shed their constitutional rights to freedom of speech or expression,'

even 'at the school house gate.'" Mahanoy, 141 S. Ct. at 2044 (quoting Tinker v. Des Moines

Indep. Cmty. School Dist., 393 U.S. 503, 506 (1969)). But courts must apply the First

Amendment "in light of the special characteristics of the school environment." Id. (quoting

Hazelwood School Dist. v. Kuhlmeier, 484 U. S. 260, 266 (1988)). Thus, student's constitutional

rights in public school "are not automatically coextensive with the rights of adults in other

settings." Cox, 654 F.3d at 272 (quoting Morse v. Frederick, 551 U.S. 393, 396–97 (2007)).

Given the special characteristics of the school environment, courts in the Second Circuit

have established three circumstances when school administrators may punish or censor student

speech without offending the First Amendment. In other words, student speech is not considered

"protected" if one of these three standards is met. Id. (setting forth the three circumstances when

student speech is not "protected under the First Amendment").

First, "school administrators may, as part of their responsibility to 'teach[] students the

boundaries of socially appropriate behavior,' punish student speech that is vulgar, lewd, or

threatening, at least where that speech occurs publicly at school or a school-related event." Cox,

654 F.3d 272 (quoting Bethel School Dist. No. 403 v. Fraser, 478 U.S. 675, 681 (1986)).

Second, "[w]hen students speak pursuant to the school curriculum such that their speech

may be perceived as being endorsed or promoted by the school, _e.g._, school newspapers,

theatrical productions—school administrators may exercise editorial control over that speech 'so long as their actions are reasonably related to legitimate pedagogical concerns.'" Cox, 654 F.3d at 272 (quoting Hazelwood, 484 U.S. at 271–73).

Third, for all other speech, "meaning speech that is neither vulgar, lewd, indecent or plainly offensive under Fraser, nor school-sponsored under Hazelwood," administrators may only regulate it if it would "materially and substantially disrupt classwork and discipline in the school," or invade the rights of others. Guiles v. Marineau, 461 F.3d 320, 325 (2d Cir. 2006); see also Mahanoy, 141 S. Ct. at 2045 (quoting Tinker, 393 U.S. at 513).

The Court must determine which of these three standards to apply in deciding whether Plaintiff's speech is protected.

### a.   Determining the Proper Standard

Neither party argues the Fraser standard is relevant here. Indeed, interpreting the Complaint's allegations in the light most favorable to Plaintiff, none of Plaintiff's speech at issue was made publicly and was vulgar, lewd, or threatening such that the Fraser standard would apply.

Likewise, this is not a case where school administrators determined what "manner of speech in the classroom or in school assembly is inappropriate.," such that Hazelwood applies. Collins, 979 F.3d at 133. Neither is it an instance where educators sought to "excercis[e] editorial control over the style and content of student speech." Hazelwood, 484 U.S. at 272. Defendants did not object to the content of Plaintiff's proposed graduation speech and seek to censor it to remove objectionable messages. Indeed, Plaintiff was selected as a speaker by school administration precisely *because* of the content of his intended speech, Compl. ¶¶ 10–12, and the Board, in ratifying Monroe's decision to remove Plaintiff, allegedly did so without a copy of the

speech and without reviewing its contents, id. ¶ 45. Rather, Defendants excluded Plaintiff as a response to his *past speech*, i.e., his creation of the Bracket and a statement Plaintiff made in his book. Compl. ¶ 39 ("Monroe stated to Wang during the June 15th call as an explanation for her exclusionary decisions and actions: some girls were 'very upset' by the bracket in 2018 . . . and a statement in his book . . . 'rubbed her the wrong way'").

Thus, because neither Fraser nor Hazelwood apply, the Court must utilize the Tinker standard to determine if Plaintiff's speech is protected by the First Amendment. See Guiles, 461 F.3d at 513 (holding that where neither Hazelwood nor Fraser apply, "the rule of Tinker applies."); see also Cox, 654 F.3d at 272–73 (setting forth Fraser, Hazelwood, and Tinker as the three standards that may be applied to determine if speech is protected for purposes of a First Amendment retaliation claim).

    b.  Application of the Tinker Standard to Determine if Plaintiff's Speech was Protected

As stated above, under Tinker, school administrators are allowed to punish or prevent student speech without offending the First Amendment if they reasonably believe the speech will "materially and substantially disrupt classwork and discipline in the school," or substantially invade the rights of others. Guiles, 461 F.3d 325; Mahanoy Area School Dist. v. B. L, 141 S. Ct. 2038, 2045 (2021); Tinker requires not only a potential for disruption, but also that "the concern for disruption, rather than some other, impermissible motive, was the actual reason for" the punishment imposed. Locurto v. Giuliani, 447 F.3d 159, 179 (2d Cir. 2006).

Defendants argue it was reasonable for them to believe that Plaintiff's past speech would cause material disruption of classwork and invade the rights of others if he were to be allowed to participate at the graduation ceremony, and thus their exclusion of him from "an after-school extracurricular activity" did not violate Plaintiff's First Amendment rights. Defs.' Mem. at 12–

35

14. Plaintiff's past speech consists of the creation of the Bracket, as well a statement in his book that "if girls made a bracket of guys, guys would laugh it off." Compl. ¶ 59.

The contours of what constitutes a sufficiently material disruption under Tinker are not firmly defined. Guiles v. Marineau, 461 F.3d 320, 322 (2d Cir. 2006) ("Nor is Tinker entirely clear as to what constitutes 'substantial disorder' or 'substantial disruption' of or 'material interference' with school activities."). Threats of violence against teachers or students are generally considered sufficiently disruptive. See Cuff ex rel. B.C. v. Val. Cent. School Dist., 677 F.3d 109, 112-13 (2d Cir. 2012) (finding substantial disruption where student drew a picture of an astronaut blowing up school with teachers inside and showed it to other students); Cf. Tinker, 393 U.S. 503 (1969) (finding no material disruption in part because "there were no threats or acts of violence on school premises"). Likewise, statements specifically directing students to disrupt school activities have been found sufficiently disruptive. See Doninger v. Niehoff, 527 F.3d 41, 50 (2d Cir. 2008) (finding plaintiff's statement directing other students to "call the 'douchebags' in the central office to 'piss [them] off more'" sufficiently disruptive). However, mere offense of a group of students is generally not viewed as sufficiently disruptive. See Mahanoy, 141 S. Ct. at 2047–48 (finding students' complaints of offense insufficient to create reasonable fear of substantial disruption); Guiles, 461 F.3d at 330–331 (finding no sufficient disruption where school officials forced plaintiff to remove a shirt because a student and parent had complained that it offended them).

Under Tinker it is relevant, but not dispositive, that Plaintiff's speech occurred away from school grounds. The additional leeway granted to schools under the First Amendment due to their special characteristics is "diminished" when student speech takes place off-campus.

Mahanoy, 141 S. Ct. at 2045–46. Even so, a school's interest in preventing substantial disruption may still remain "significant in some off-campus circumstances." Id. at 2045.

Interpreting the allegations of the Complaint in the light most favorable to Plaintiff, the Court cannot say that Plaintiff's creation of the Bracket represented a reasonable risk of substantial disruption to school discipline or classwork if Plaintiff were not removed from the graduation ceremony. Rather than anything inherently obscene, the Complaint describes the Bracket as seeking to identify "the two most liked or admired girls." Compl. ¶ 59. The fact that the Bracket was communicated off-campus to a small circle of friends beyond which it was not intended to spread, id. ¶ 63, and did not target any member of the school community with abusive language, further diminishes the school's interest in removing Plaintiff from an extracurricular activity as punishment for such speech. See Mahanoy, 141 S. Ct. at 2047 (holding school's interest in punishing speech by removing student from extracurricular activity was diminished where student spoke off-campus, and "did not identify the school in her posts or target any member of the school community with vulgar or abusive language. [And] also transmitted her speech . . . to an audience consisting of her private circle.").

Likewise, Plaintiff's view, expressed in his book, that "if girls made a bracket of guys, guys would laugh it off," while certainly objectionable to some, does not present a reasonable risk of substantial disruption to the school's activities. Indeed, it does not appear from the Complaint that this statement was referenced by, or known to, any students at Plaintiff's school, including those who complained. See Compl. ¶ 39 (alleging that Monroe stated only that students had complained who were "'very upset' by the bracket in 2018"). Also, during Plaintiff's initial discussion with Monroe regarding Plaintiff's removal, Monroe did not state she

was worried the statement in the book could cause disruption, but rather only that it "rubbed her the wrong way." Id.

According to the allegations in the Complaint, the only disruption that was of concern to Defendants was the potential offense of "some" students who had complained about Plaintiff's creation of the Bracket. Id. As stated above, the potential offense of a small number of students is not sufficiently disruptive to justify removal of a student from an extracurricular activity as punishment, especially where that speech occurs off-campus. See Mahanoy, 141 S. Ct. at 2047–48; Guiles, 461 F.3d at 330–331.

Similarly, while Defendants argue the Bracket "invaded the rights of the female students who were included" in it, Defs.' Mem. at 13, they do not specify which rights would be invaded by Plaintiff speaking at graduation, other than the right to not be offended, which is insufficient under Tinker. See Mahanoy, 141 S. Ct. at 2047 (finding no "threatened harm to the rights of others that might justify the school's action" despite several students complaining to administrators that they were offended).

Thus, the Court finds that Plaintiff's speech in creating the Bracket and writing a book are protected activity under the First Amendment.

>   c.   Plaintiff's Speech Does Not Constitute Unprotected Harassing Speech

Defendants argue that "the Bracket was a form of harassing speech," and thus the speech is not protected under Tinker. Defs.' Mem at 13–14. They contend that the Supreme Court held in Mahanoy that "serious or severe bullying or harassment targeting particular individuals" is an off-campus behavior that calls for school regulation. Defs.' Mem. at 14 (citing Mahanoy, 141 S. Ct. at 2045).

To begin, this argument is based on a subtly mistaken interpretation of the Supreme Court's Decision in Mahanoy. There, the court describes a list of exceptions *provided by the defendant* where that party argued a school should maintain a regulatory interest in off-campus speech. Mahanoy, 141 S. Ct. at 2045. Included in this list was "serious or severe bullying or harassment targeting particular individuals." Id. However, the court declined to adopt such a list, stating it was "uncertain as to the length or content of any such list of appropriate exceptions or carveouts," and instead relied on application of the general Tinker standard. Id.; see also id. at 2057 ("Bullying and severe harassment are serious (and age-old) problems, but these concepts are not easy to define with the precision required for a regulation of speech.") (Alito, J., concurring).

In any event, it may very well be true that severe bullying or harassment targeting particular individuals presents a sufficient risk of disruption under Tinker to warrant school discipline and/or removal from an extracurricular activity. But the Court cannot characterize the Bracket as "severe" bullying or harassment at this point in litigation. As stated above, the Bracket was meant to "communicate[] the votes by several boys . . . following private discussions . . . to identify the two most liked and admired girls." Compl. ¶ 59. The Court cannot say that this constitutes severe bullying or harassment, especially when it is reasonable to infer that it was not intended to reach any other students or school grounds. Id. ¶ 32.

### 2. Adverse Action

Having established that Plaintiff's speech was protected by the First Amendment, the Court turns to whether the actions taken by Defendants in revoking his position as a speaker at graduation constitutes an action sufficiently adverse to make out a cognizable claim for retaliation.

While "there is no clear definition of 'adverse action' in the school context . . . [o]utside the school context, an adverse action in a First Amendment retaliation case is 'conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights.'" Cox, 654 F.3d at 273 (quoting Zelnik v. Fashion Inst. of Tech., 464 F.3d 217, 225 (2d Cir. 2006)). This test is highly context-specific and must be applied "in light of the special characteristics of the school environment." Id. (quoting Tinker, 393 U.S. at 506).

Defendants argue that the Court should follow the reasoning found in Vetrano v. Miller Place Union Free School Dist., 369 F. Supp. 3d 462 (E.D.N.Y. 2019). Defs.' Mem. at 12–13. In Vetrano, the court granted a defendant school district's motion for summary judgment, finding that barring a student from participating in an extracurricular activity was at most a "de minimus deprivation" because "the participation in extracurricular activities is a privilege, not a right." Vetrano, 369 F. Supp. 3d at 473.

The Court declines to adopt a rule that removal from participation in an extracurricular activity is *per se* insufficiently adverse because such participation is a "privilege." There could very well be instances where revocation of participation in an extracurricular activity is sufficiently adverse to dissuade an individual of ordinary firmness from exercising their constitutional rights.

Specifically, making all reasonable inferences in favor of Plaintiff, the extracurricular activity at issue here, as alleged in the Complaint, is of greater importance and more significance than that at issue in Vetrano. The activity in Vetrano was a "variety show," comprised of skits and talent acts performed by members of the senior class. Id. at 467. The Court granted the school district summary judgment because the activity was a mere "voluntary, extracurricular

activity." Id. at 473. Such extracurricular activities are likely similar to many such activities that take place throughout a student's time in school.

However, the graduation ceremony here is described as having "long term significance, as the selection and award would be recorded in Wang's High School student records, and in records, reports and articles about his High School Graduation and class." Compl. ¶ 15. The speech would have enduring value and be shown at "future reunion events, with it viewed multiple times by his classmates." Id. ¶ 16. Additionally, a high school graduation is a one-time event. Further adding to the adverse nature of Defendants' actions, Plaintiff alleges that Monroe's allegedly false description of the Bracket as "sexual harassment," dissemination of inaccurate complaints against him, and Defendants' choice to remove him from his position based on these false allegations against him, caused him to be subjected to "continued vilification and stigmatization." Resp. at 11; Compl. ¶ 81.

Construing all allegations in the light most favorable to Plaintiff, the Court finds that Defendants' actions would be sufficient to deter a student of ordinary firmness from exercising his first amendment rights. Thus, the Court finds Plaintiff has alleged facts sufficient to establish the existence of an adverse action.

### 3. Causal Connection

Finally, Plaintiff must establish that "there was a causal connection between this adverse action and the protected speech." Cox v. Warwick Val. Cent. School Dist., 654 F.3d 267, 272 (2d Cir. 2011) (citing Scott v. Coughlin, 344 F.3d 282, 287 (2d Cir. 2003)). This requires a plaintiff to show "some evidence of retaliatory intent to cause the adverse effect." Brandon v. Kinter, 938 F.3d 21, 40 (2d Cir. 2019). A causal connection for retaliation claims can be shown either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory

treatment, or through other circumstantial evidence; . . . or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." Littlejohn v. City of N.Y., 795 F.3d 297, 319 (2d Cir. 2015) (quoting Gordon v. N.Y.C. Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000)).

Plaintiff has alleged facts from which it may reasonably be inferred that Defendants rescinded his invitation to speak at graduation in retaliation for the creation of the Bracket and his statements in his book.

While Defendants' actions were not close in time to Plaintiff's creation of the Bracket or writing of the book, it may be reasonably inferred that Defendants acted shortly after they first learned of this past speech. Compl. ¶ 32 (indicating the matter had initially been handled by Principal Doemel in 2018, and that Defendants never "investigate[d] or ascertain[ed] the details regarding Principal Doemel's resolution"); see also Dougherty, 282 F.3d at 91 (finding retaliatory intent sufficiently alleged in part because defendants acted shortly after learning of protected conduct).

Further, Defendants' actions were described as a "punitive measure" for Plaintiff's past speech by the Commissioner of Education. Compl. ¶ 57. The complaints to which Defendants responded explicitly sought "additional disciplinary or punitive sanctions" for Plaintiff's past speech. Id. ¶ 22. And Monroe stated that she was rescinding Plaintiff's invitation in part because the statement he made in his book "rubbed her the wrong way." Id. ¶ 39.

These facts, taken together and interpreted in the light most favorable to Plaintiff, are sufficient to create a reasonable inference that Defendants acted with retaliatory intent and that there was a causal connection between the protected speech and the adverse action.

Thus, the Court finds Plaintiff's speech was protected conduct, that Defendants' actions were sufficiently adverse and were causally connected to the protected speech. Therefore, the Court denies Defendants' motion to dismiss regarding Plaintiff's claim for First Amendment Retaliation.

### G.  First Amendment Viewpoint Discrimination

Viewpoint discrimination is forbidden even in non-public fora such as schools, and occurs when "the government targets not subject matter but particular views taken by speakers on a subject." Wandering Dago, Inc. v. Destito, 879 F.3d 20, 31 (2d Cir. 2018) (quoting Rosenberger v. Rector & Visitors of Univ. of Va., 515 U.S. 819, 828 (1995)). The government targets specific views when it seeks to regulate speech and "the specific motivating ideology or the opinion or perspective of the speaker" is the rationale for the restriction. Id. (quoting Rosenberger, 515 U.S. at 829).

Defendants argue Plaintiff was not removed as a speaker because of concerns about the viewpoints or content of his speech, but "because of complaints from female students and parents about Plaintiff's past conduct, and concerns about the reactions from other students attending the graduation." Defs.' Mem. at 15.

Plaintiff responds that Defendants' exclusion of him from speaking at graduation constitutes viewpoint discrimination because he was excluded from speaking "because of the substance or advisory nature of his Resilience Speech, the perspective or message they associated with Wang as a creator of the Bracket or of the message Monroe objected to in his book." Resp. at 14

The Complaint alleges the following regarding the potential motivation for Defendants' exclusion of Plaintiff as a graduation speaker:

Monroe stated to Wang during the June 15th call as an explanation for her exclusionary decisions and actions: some girls were "very upset" by the bracket in 2018 but others "didn't really care"; the recent complaints were likely from those very upset in 2018; she did not know how many classmates were still upset; permitting Wang to be the keynote speaker would be perceived as honoring him; his Resilience Speech was objectionable because it would be perceived as providing advice to students; honoring him or allowing him to give advice might offend or upset some girls or their parents; and a statement in his book, A Teenage Boy's Perspective on Life, published in 2019, about the differing responses of girls and boys ("if girls made a bracket of guys, guys would laugh it off") had "rubbed her the wrong way".

Compl. ¶ 39.

The viewpoints that Plaintiff alleges were discriminated against fall into two categories: viewpoints expressed prior to his exclusion, Resp. at 14 ("the perspective or message [Defendants] associated with Wang as a creator of the bracket or of the message Monroe objected to in his book"), and viewpoints expressed in his proposed graduation speech itself, id. ("Defendants excluded him from speaking at the graduation ceremony because of the substance or advisory nature of his Resilience Speech").

### 1. Viewpoints Espoused Prior to Exclusion

Plaintiff argues that exclusion of an individual due to a past viewpoint they have expressed constitutes viewpoint discrimination. However, that, in and of itself, does not create a viable foundation for such a claim.

Viewpoint discrimination claims generally relates to actions by government officials taken to censor or prohibit a certain message from being communicated at a certain future time and place due to the content of that message. See, e.g., Peck v. Baldwinsville Cent. School Dist., 426 F. 3d. 617, 622 (2d Cir. 2005) (alleging viewpoint discrimination where school prevented student from displaying poster containing religious imagery at assembly); McKay, 510 Fed. App'x at 6 (2d Cir. 2013) (alleging viewpoint discrimination where school removed sentence

from student's proposed speech that was deemed "too religious"). It may be possible that a government action excluding a party from speaking in a certain forum may also support a claim of viewpoint discrimination even if the viewpoint at issue is expressed previously outside the forum from which they have been excluded and is not contained directly in the speech that has been excluded. For example, the Supreme Court's decision in <u>Cornelius</u>, upon which Plaintiff relies, could be read to state that when the federal government did not allow the NAACP to communicate solicitations for donations to employees, it did so because it disagreed with the NAACP's viewpoints generally, rather than because the government objected to any viewpoint expressed in the excluded solicitation itself. <u>See</u> 473 U.S. at 812 (remanding because organizations may have been excluded because the government "disagreed with their viewpoints.").

Even if the Court accepts this interpretation of <u>Cornelius</u>, to amount to viewpoint discrimination, a government action must always be undertaken "to suppress the point of view" of the speaker in one form or another. <u>Id.</u> at 806. This necessarily requires a reasonable inference that the government action prevented spread of the viewpoint in the future, rather than merely an objection to viewpoints stated in the past. Prevention of the future spread of a viewpoint was present in <u>Cornelius</u> as well, in that inhibiting the NAACP's ability to obtain donations would inhibit their ability to communicate their ideas in the future. <u>Cornelius</u>, 473 U.S. at 799, 811 ("without the funds obtained from solicitation . . . the organization's continuing ability to communicate its ideas and goals may be jeopardized."); <u>see also</u> <u>id.</u> at 812 (remanding because "the issue whether the Government excluded respondents because it disagreed with their viewpoints was neither decided below nor fully briefed before this Court.").

Here, the Court cannot reasonably infer that Defendants disinvited Plaintiff to suppress the future spread of his past viewpoints. The speech he intended to give made no reference to either the Bracket or the book. See generally Dkt. No. 1-2 ("Resilience Speech). There are also no allegations that Defendants' disinvitation could have inhibited Plaintiff's ability to spread those points of view by other means, as in Cornelius, or allegations leading to a reasonable inference that it was intended to do so.

### 2. Viewpoints Contained in Proposed Graduation Speech

Second, Plaintiff argues he was excluded due to the "advisory nature of his speech" and that this constitutes viewpoint discrimination. Resp. at 14. The Complaint alleges that "Monroe stated . . . some girls were 'very upset' by the bracket . . . the recent complaints were likely from those very upset in 2018 . . . [and] his Resilience Speech was objectionable because . . . allowing him to give advice might offend or upset some girls." Compl. ¶ 39.

The most natural inference created by these allegations is that Monroe removed Plaintiff as speaker because the fact of him giving advice at all would be offensive due to his past conduct, not because the advisory viewpoints contained in the speech themselves, were objectionable and should be suppressed. However, the test for a plaintiff's allegations at this stage of litigation is not that an inference supporting their claims be the strongest possible given a set of allegations, or that it be the most intuitive, but merely that it be *plausible* and more than a mere possibility. Lynch v. City of N.Y., 952 F.3d 67, 74 (2d Cir. 2020) ("[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'") (quoting Iqbal, 556 U.S. at 679). Further, "[t]he assessment of whether a complaint's factual allegations plausibly give rise to an entitlement to relief 'does not impose a probability

requirement at the pleading stage; it simply calls for enough fact to raise a reasonable

expectation that discovery will reveal evidence of illegal' conduct." Id. at 75.

As stated above, the existence of two distinct instances of speech somewhat obscures

Defendants' motivations for preventing Plaintiff from speaking at the graduation ceremony.

However, the Court finds Plaintiff's allegations are sufficient to create a plausible inference that

Monroe prevented Plaintiff from speaking due to the substance of the advisory viewpoints he

intended to express.[14] The Complaint alleges that Monroe reviewed the advisory content of

Plaintiff's proposed speech, described it as "objectionable," and then stated Plaintiff should not

be allowed to give advice because it would cause offense. Compl. ¶ 39. While it is a close call—

and it is certainly possible Monroe did not base her decision on the viewpoints expressed in the

speech whatsoever—these allegations create a plausible inference that the "specific . . .

perspective of the speaker" set forth in Plaintiff's proposed speech was the rationale for

Monroe's actions, and that discovery will reveal evidence supporting that claim. See Wandering

Dago, 879 F.3d at 31 (stating that viewpoint discrimination occurs when "the specific motivating

ideology or the opinion or perspective of the speaker" is the rationale for speech restriction.)

(quoting Rosenberger, 515 U.S. at 829); see also Peck, 426 F. 3d at 631 (denying summary

judgment as to viewpoint discrimination claim where it was possible officials had prevented

---

[14] In analyzing Plaintiff's claim of retaliation, the Court interpreted the allegations in the light
most favorable to Plaintiff regarding that claim and found it was reasonable to infer Defendants
were acting to punish Plaintiff for his past speech rather than due to the content of Plaintiff's
forthcoming graduation speech. See supra Section IV(F)(1)(a). The Court now interprets the
allegations in the light most favorable to Plaintiff regarding his claim for viewpoint
discrimination and finds it is reasonable to infer Defendants acted due to the content of his
graduation speech. See Lynch, 952 F.3d at 75 ("Because plausibility is a standard lower than
probability, a given set of actions may well be subject to diverging interpretations, each of which
is plausible.") (quoting Anderson News, L.L.C. v. American Media, Inc., 680 F.3d 162, 184-85
(2d Cir. 2012)).

student speech due to particular viewpoint expressed, rather than other motivations also supported by the evidence).

### 3. Defendants' Alleged Actions do not Constitute Permissible Content-Based Discrimination

Defendants argue that if the Court does find their actions were based on the content of Plaintiff's proposed speech, that such actions constitute permissible content-based discrimination as opposed to viewpoint discrimination. Defs.' Mem. at 14–15.

In contrast with viewpoint discrimination which entails exclusion of a certain perspective on a given subject matter, "content discrimination entails the exclusion of a 'general subject matter' from a forum." McKay, 510 Fed. App'x at 8. Content-based discrimination is generally allowed in schools, so long as the permissive standard set forth in Hazelwood is met, 484 U.S. at 273, but viewpoint-based discrimination is traditionally prohibited. See Peck, 426 F. 3d. at 630 (Stating that content discrimination "is permissible in a non-public forum [such as a school], and viewpoint discrimination . . . traditionally has been prohibited even in non-public fora.").

As discussed above, it is reasonable to infer from the allegations in the Complaint that Monroe acted to suppress the specific advisory viewpoints contained in Plaintiff's speech. Defendants did not exclude a "general subject matter." It is not alleged, for example, that Defendants excluded all advice from the graduation ceremony, but rather only the advice Plaintiff wished to give. Thus, Monroe's conduct cannot be described as content-based discrimination.

Because Plaintiff plausibly alleges Monroe prevented him from speaking out of a desire to suppress the advisory viewpoints contained in his speech, Defendants' Motion to Dismiss is denied regarding Plaintiff's claim for viewpoint discrimination.

### H.  Fourteenth Amendment Substantive Due Process

For a substantive due process claim to survive a 12(b)(6) motion to dismiss, it must (1) identify a constitutional right or property interest protected by the Fourteenth Amendment and (2) allege governmental conduct that "is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience," or that is arbitrary in the constitutional sense. See Valez v. Levy, 401 F.3d 75, 85, 93 (2d. Cir. 2005); see also Horton v. Westling, 284 F. Supp. 3d 213, 222 (N.D.N.Y. 2018) (citing Lowrance v. Achtyl, 20 F.3d 529, 537 (2d Cir. 1994)). An action is sufficiently arbitrary if it "is so outrageously arbitrary as to constitute a gross abuse of governmental authority." Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 505 (2d Cir. 2001).

Plaintiff argues that he has several property interests, including an interest in his reputation, and a contract-based interest in speaking at graduation, all of which were infringed by Defendants' actions. Resp. at 17–18.

Even assuming Plaintiff has established constitutionally cognizable property interests, the Complaint does not allege conduct that is sufficiently egregious or arbitrary to implicate Plaintiff's substantive due process rights.

In support of his claim for substantive due process, Plaintiff points to three actions the Defendants undertook that he argues are sufficiently outrageous:

> i) the District imposed an additional sanction on Wang with respect to a matter that had been fully resolved in April 2018; ii) the sanctions were imposed without a finding that Wang engaged in "prohibited student conduct" as defined in the District Code of Conduct V.; and iii) the sanctions were imposed by the District without identifying or basing it on any express standard, rule, regulation, Speech Competition specification, or stated authority but basing it upon Monroe's (and the BOE's) subjective views, assumptions, and biases.
>
> Compl. ¶ 90.

49

While these allegations, if true, could be considered distasteful, substantive due process protections "are available only against egregious conduct which goes beyond merely offend[ing] some fastidious squeamishness or private sentimentalism and can fairly be viewed as so brutal and offensive to human dignity as to shock the conscience." Nicole Dayes v. Watertown City School District et al., No. 20-CV-964, 2021 WL 4407385, at *4 (N.D.N.Y. 2021) (quoting Smith v. Half Hollow Hills Cent. Sch. Dist., 298 F.3d 168, 173 (2d Cir. 2002)). The threshold for establishing egregious conduct sufficient to warrant substantive due process claims in a school environment is high. See, e.g., Dayes, 2021 WL 4407385, at *4 ("[T]he threshold for establishing a constitutional tort in a school environment is high."); B.A. v. City of Schenectady Sch. Dist., 209 F. Supp. 3d 515, 523 (N.D.N.Y. 2016) ("[A] review of the applicable case law from our Circuit makes clear that 'the threshold for establishing a constitutional tort in a school environment setting [remains] high." (quoting J.E. ex rel. Edwards v. Ctr. Moriches Union Free Sch. Dist., 898 F. Supp. 2d 516, 538 (E.D.N.Y. 2012))).

Accordingly, courts commonly find conduct much more egregious than that at issue to be insufficiently outrageous to support a substantive due process claim. See e.g., Smith, 298 F.3d at 173 (holding that striking a student with full force in the face "without any pedagogical or disciplinary justification . . . [was] undeniably wrong," but not sufficiently egregious to warrant substantive due process protection); B.A., 209 F. Supp. 3d at 524 (finding teacher's conduct not sufficiently egregious where teacher "grabbed him by both arms, shook him by the shoulders, slammed him into a chair, and yelled in his face that he should "stop crying" between thirteen and twenty times.").[15]

---

[15] See also Edwards, 898 F. Supp. 2d at 538 (holding that a security guard who punched and yelled racial epithets at students while trying to break up a fight did not violate substantive due process); Perrin v. Canandaigua City Sch. Dist., No. 08-CV-6135, 2008 WL 5054241, at *4

Even so, school officials' conduct has been deemed sufficiently egregious in some circumstances. See, e.g., Johnson v. Newburgh Enlarged Sch. Dist., 239 F.3d 246, 249 (2d Cir. 2001) (finding teacher's conduct conscience-shocking where he dragged student across gym floor, choked him, slammed back of his head against bleachers four times, rammed his forehead into a metal fuse box, and punched him for no legitimate purpose); Knicrumah v. Albany City School District, 241 F. Supp. 2d 199, 205, 211 (N.D.N.Y.2003) (finding conduct sufficiently conscience-shocking where teacher grabbed student, slammed him against a brick wall "without reason or provocation," held him there and threatened to "have him kicked off the track team.").

Given the guideposts provided in caselaw, and even viewing the allegations in the light most favorable to Plaintiff, Defendants' imposition of additional sanctions years after a matter was resolved and without a specific finding as required by the District's Code of Conduct are not sufficiently "brutal" and "offensive to human dignity" to invoke the protections of substantive due process.

Nor does the Court find it sufficiently egregious or arbitrary that Defendants imposed sanctions based on subjective views and biases without identifying specific rules or authority. Substantive due process does not protect against all improper government actions even when they "might fairly be deemed arbitrary or capricious." Harlen Assocs. v. Inc. Vill. of Mineola, 273 F.3d 494, 505 (2d Cir. 2001) (quoting Natale v. Town of Ridgefield, 170 F.3d 258, 263 (2d Cir. 1999)). Rather, a governmental action must be "so outrageously arbitrary as to constitute a gross abuse of governmental authority." Id. The protections of substantive due process are aimed

---

(W.D.N.Y. Nov. 21, 2008) (holding that a teacher forcing a student's arms behind his back, pushing the student into the locker room, and punching and poking the student in the chest while berating him with profane and demeaning language was insufficiently egregious); Yap v. Oceanside Union Free Sch. Dist., 303 F. Supp. 2d 284, 297 (E.D.N.Y. 2004) (holding racist statements made to a student by school staff insufficiently egregious).

at government decisions undertaken with no legitimate justification or state interest. Compare Valez, 401 F.3d at 93 (stating that the purpose of substantive due process is to protect the individual 'against . . . the exercise of power without any reasonable justification in the service of a legitimate governmental objective.'" (quoting Cnty. of Sacramento v. Lewis, 523 U.S. 833, 845–46 (1998))); Brady v. Town of Colchester, 863 F.2d 205, 215 (2d Cir. 1988) (finding potential substantive due process violation where property interest destroyed with "no rational basis"); and Newburgh, 239 F.3d at 252 (finding teacher's assault on student conscience-shocking in part due to "the absence of a discernible government interest."); with Lowrance v. Achtyl, 20 F.3d 529, 537 (2d Cir. 1994) (finding government action not "arbitrary in the constitutional sense" where it had "reasonable grounds."). Such protections are not meant for government acts that are merely "incorrect or ill-advised." Lowrance, 20 F.3d at 537.

Here, the allegations in the Complaint establish legitimate grounds for Defendants' actions: the complaints received from parents and students about Plaintiff speaking and potential disruption of the graduation ceremony.[16] Compl. ¶ 23 ("In reliance upon and deference to such complaints, Monroe, acting under color of New York law and her claimed statutory and District authority, revoked the Speech Committee's selection of Wang's speech and Wang."). Thus, the

---

[16] Alternatively, the Court could interpret the facts alleged in the Complaint to infer that Defendants acted without a legitime desire to avoid disruption and offense, but instead to punish Plaintiff for his past speech because they found such speech objectionable, or to suppress viewpoints contained in his graduation speech. See supra Sections IV(H), IV(G). Such an interpretation would certainly increase the arbitrariness and outrageousness of Defendants' acts. However, were the Court to do so, the facts that rendered the action outrageous would also give rise to more specific independent constitutional violations, and Plaintiff's substantive due process claim would be subsumed by Plaintiff's more specific First Amendment claims for retaliation and viewpoint discrimination. See Velez, 401 F.3d at 94 ("[W]here a specific constitutional provision prohibits government action, plaintiffs seeking redress for that prohibited conduct in a § 1983 suit cannot make reference to the broad notion of substantive due process.").

Court does not find that Defendants' actions are so arbitrary as to constitute a "gross abuse of governmental authority." Harlen, 273 F.3d at 505.

The Court declines to follow the reasoning set forth in Soglin v. Kauffman, 418 F2d 163, 168 (7th Cir 1969), a fifty-year-old case from the Seventh Circuit that Plaintiff argues stands for the proposition that a school violates substantive due process when it punishes students without identifying specific rules that were been violated. Resp. at 17. The Court declines to adopt a rule that a school per se violates due process by undertaking such an action, and instead follows the more general Second Circuit standard that conduct must be so arbitrary that it constitutes "gross abuse of governmental authority." In doing so, the Court is cognizant of the "need to preserve the constitutional proportions of constitutional claims, lest the Constitution be demoted to . . . a font of tort law." B.A., 209 F. Supp. 3d at 522 (N.D.N.Y. 2016); (quoting Smith, 298 F.3d 168, 173 (2d Cir.2000)).

Given the above, the Court dismisses Plaintiff's claim for violation of his substantive due process rights.

## I.   Fourteenth Amendment Procedural Due Process

To state a procedural due process claim, a plaintiff must show that (1) he possessed a constitutionally protected property or liberty interest, (2) the state deprived him of that interest, and (3) the deprivation occurred without appropriate due process. McMenemy v. City of Rochester, 241 F.3d 279, 285–86 (2d Cir. 2001); see also White Plains Towing Corp. v. Patterson, 991 F.2d 1049, 1061–62 (2d Cir. 1993).

### 1. Possession and Deprivation of Property Interests

Plaintiff argues he possessed two property interests of which he was deprived: his reputation under a "stigma plus" theory, and a contractual right to speak at graduation. Resp. at 19.

### a. Stigma Plus

To establish a stigma plus claim, a plaintiff must allege "(1) the utterance of a statement about [him] that is injurious to [his] reputation, 'that is capable of being proved false, and that he or she claims is false,'" (2) "[t]he defamatory statement must be sufficiently public to create or threaten a stigma," and (3) "some tangible and material state-imposed burden . . . in addition to the stigmatizing statement," entailing the "termination or alteration of some other legal right or status." Velez v. Levy, 401 F.3d 75, 87–88 (2d. Cir.2005) (quoting Doe v. Dep't of Pub. Safety ex rel. Lee, 271 F.3d 38, 47 (2d Cir. 2001)).

To meet the first prong of stigma plus, the alleged injurious statement must "call into question a plaintiff's 'good name, reputation, honor, or integrity.'" Paterson v. City of Utica, 370 F. 3d 322, 330 (2d Cir 2004) (quoting Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 446 (2d Cir. 1980)). While Plaintiff argues that Monroe "denigrated" him, he does not point to specific statements from Monroe that were denigratory. See Resp. at 19. The only statement in the Complaint that reasonably calls into question Plaintiff's good name, reputation, honor, or integrity is Monroe's description of his past conduct as "sexual harassment" in her letter to the Commissioner on June 25, 2020. Compl. ¶ 52.

Such a statement is a matter of opinion that cannot be proven true or false and would thus fail the first prong of the stigma plus test. See Wiese v. Kelley, No. 08-CV-6348, 2009 WL 2902513, at *6 (S.D.N.Y. Sept. 10, 2009) ("The Attorney General's description of the conduct

. . . as 'extremely troubling' is a statement of opinion, rather than fact, and as such is not actionable as a stigmatizing remark."). Additionally, Monroe's statement in a letter to the Commissioner is not sufficiently public to meet the stigma plus test absent any allegations that the statement spread further or was available to the public. See Petrone v. Hampton Bays Union Free Sch. Dist., No. 03-CV-4359, 2013 WL 3491057, at *34 (E.D.N.Y. July 10, 2013) (finding statements made during non-public proceedings insufficiently public to support stigma plus claim) aff'd, 568 F. App'x 5 (2d Cir. 2014). Accordingly, the Court finds Plaintiff has not established his reputation as a constitutionally cognizable property interest, deprivation of which gives rise to procedural due process protections.

b.  Contractual Rights

"[N]ot every contractual benefit rises to the level of a constitutionally protected property interest. It is neither workable nor within the intent of section 1983 to convert every breach of contract claim against a state actor into a federal claim." Radwan v. Univ. of Conn. Bd. of Trs., 465 F. Supp. 3d 75 (D. Conn. 2020) (quoting Ezekwo v. N.Y.C. Health & Hosps. Corp., 940 F.2d 775, 782 (2d Cir. 1991)). To warrant due process protection, a contract must protect the contract holder from the state's revocation of "a *status*, an estate within the public sphere characterized by a quality of either extreme dependence in the case of welfare benefits, or permanence in the case of tenure, or sometimes both." Gizzo v. Ben-Habib, 44 F. Supp. 3d 374, 385–86 (S.D.N.Y. 2014) (emphasis in original) (quoting S & D Maint. Co. v. Goldin, 844 F.2d 962, 966 (2d Cir. 1988)) (collecting cases). This is distinct from contracts that merely arise from voluntary relationships. Id. at 386 (citing Rosenfeld v. Port Auth. of N.Y. & N.J., 108 F. Supp. 2d 156, 166 (E.D.N.Y. 2000). Several courts have suggested "the Second Circuit has found cognizable property interests in contracts only in the employment context." Id. (quoting

Malapanis v. Regan, 340 F. Supp. 2d 184, 190 (D. Conn. 2004), aff'd, 147 F. App'x 219 (2d Cir. 2005)) (collecting cases).

The parties' alleged contract, if indeed a contract existed, is not of the sort that gives rise to a cognizable property interest. It was a single, voluntary interaction, that did not protect Plaintiff from deprivation of an estate within the public sphere. Likewise, there was no element of "extreme dependence" or permanence in Defendants' purported agreement to have Plaintiff speak at a graduation ceremony. See Gizzo, 44 F. Supp. 3d at 387–388 (finding licensing agreement with city was merely the product of voluntary contractual relationship, and did not have any elements of extreme dependence or permanence).

Therefore, the Court finds Plaintiff has not established a cognizable property interest sufficient to give rise to due process protections.

### 2. Appropriate Due Process

Even assuming *arguendo* that Plaintiff possessed a constitutionally cognizable contract right, and further assuming that his reputation, combined with his removal as speaker, was likewise a cognizable property interest, Plaintiff has still failed to establish he was deprived of those interests without appropriate due process.

Due process requires "that a hearing be held at a meaningful time and in a meaningful manner." Giglio v. Dunn, 732 F.2d 1133, 1135 (2d Cir. 1998). Usually, this requires that "individuals have 'notice and opportunity for a hearing appropriate to the nature of the case' prior to a deprivation of life, liberty, or property." Rosa R. v. Connelly, 889 F.2d 435, 438 (2d Cir. 1989) (quoting Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 313 (1950)). Even so, "where the state is effectively unable to anticipate and prevent a random deprivation of a [protected] interest . . . post deprivation remedies might satisfy due process." Velez, 401 F.3d

56

at 91 (2d Cir. 2005) (cleaned up). In other words, "where a pre-deprivation hearing is impractical and a post-deprivation hearing is meaningful, the state satisfies its constitutional obligations by providing the latter." Giglio, 732 F.2d at 1135.

Plaintiff argues that Defendants violated due process by making a final decision without providing him notice or "any meaningful opportunity to be heard" prior to the deprivation of his rights.[17] Resp. at 19; Compl. ¶ 93. However, if the interest of which Plaintiff was deprived was his reputation, the deprivation of that interest did not occur, at the earliest, until June 25, 2020, when Monroe made her allegedly stigmatizing comments characterizing Plaintiff's conduct as "sexual harassment." See Compl. ¶ 52. Similarly, if the interest deprived is Plaintiff's contract right to speak at graduation, that interest would not have been deprived until the day of the ceremony, June 26, 2020, when his alleged contractual rights were violated.

The Complaint establishes that Plaintiff was in fact given notice and some process prior to June 25, 2020. Plaintiff was notified on June 8, 2020, that his invitation to speak was to be revoked. Compl. ¶ 35. That same day, Monroe granted Plaintiff an opportunity to be heard regarding the revocation. Id. ¶ 36. On June 15, 2020, Monroe spoke with Plaintiff, heard his side of the story, and explained the basis of her decision. Id. ¶ 39–42. Monroe advised Plaintiff he

---

[17] To the extent Plaintiff argues he was denied due process because "Defendants failed to investigate the facts and relied upon erroneous and false complaints and false information to make their decisions," Resp. at 20, such a failure would constitute mere negligence, which cannot for the basis for a procedural due process claim. See Grune v. Rodriguez, 176 F.3d 27, 33 (2d Cir. 1999) (to establish deprivation, Plaintiffs must plausibly allege that Defendants "acted with more than mere negligence." (citing Daniels v. Williams, 474 U.S. 327, 328 (1986))); see also Folkerts v. City of Waverly, 707 F.3d 975, 981 (8th Cir. 2013) ("A negligent failure to investigate inconsistencies or other leads does not violate due process"); Wright v. Orleans Cty., No. 14-CV-0622, 2015 U.S. Dist. LEXIS 121653, at *58 (W.D.N.Y. Sep. 10, 2015) ("nor is negligent investigation a basis for § 1983 liability" (citing Daniels v. Williams, 474 U.S. 327, 332–33 (1986) (negligent inaction will not suffice to establish a constitutional violation because Due Process clause is not implicated by a state official's negligent act causing unintended loss)).

could communicate with the Board to appeal her decision before their June 17, 2022 meeting. Id. ¶ 43. On June 16, Plaintiff submitted a written appeal to the Board. Id. ¶ 44. On June 24, 2020, Plaintiff filed an appeal of the Board's decision to the Commission of Education, seeking a stay. Id. ¶ 51.

It is apparent that Plaintiff received notice and had multiple opportunities to be heard prior to the deprivation of his rights. Even so, Plaintiff argues that this process was insufficient because Defendants failed to provide him with the facts and bases for their decisions and actions, such that he could meaningfully defend himself. See Compl. ¶ 93; Resp. at 20. Namely, Plaintiff argues Monroe did not "state the facts or documents she relied upon, including her misunderstanding of the substance or nature of the bracket, [or] the substance of the email complaints she had relied upon," and provided a false description of the Bracket and the false complaints to the Broad. Resp. at 20. Plaintiff alleges he was not made aware of Monroe's misstatement regarding the nature of the Bracket or the content of the complaints against him until June 25, 2020, when the District filed their opposition to his request for a stay. Compl. ¶ 53.

Even if these omissions render the pre-deprivation hearings procedurally deficient, at least where some pre-deprivation process is given, the Court must consider the full set of procedural safeguards afforded a plaintiff that may cure procedural defects in the pre-deprivation process. Thus, an adequate post-deprivation remedy offered under state law may cure defects in initial process. See Moccio v. N.Y. State Office of Court Admin., 95 F.3d 195, 200 (2d Cir. 1996) (determining due process claim was not cognizable despite allegedly deficient termination proceeding because "a plaintiff must show that the 'procedural safeguards . . . established by the state are insufficient to protect [his] rights" and post-deprivation Article 78 proceedings were available (quoting Valmonte v. Bane, 18 F.3d 992, 1002 (2d Cir. 1994))); Cohn v. New Paltz

Cent. Sch. Dist., 363 F. Supp. 2d 421, 433–34 (N.D.N.Y. 2005) (Where plaintiff alleged due

process violation based on procedural errors in school decision, post-deprivation options

available under New York law "constituted part of the due process protection he received, and it

cured any procedural defect that may have occurred."); Richardson v. Capt. Van Dusen, 833 F.

Supp. 146, 153 (N.D.N.Y. 1993) (Holding that, even assuming a pre-deprivation hearing "was

conducted in [a] manner that deprived plaintiff of his due process rights, the process afforded the

plaintiff in the Article 78 proceeding cured any defect in the original hearing."); see also Campo

v. N.Y.C. Emps.' Ret. Sys., 843 F.2d 96, 103 n.7 (2d Cir. 1988) ("[I]n considering whether

defendants have failed to afford plaintiffs due process . . . the Court evaluates the entire

procedure, including the adequacy and availability of remedies under state law."). Additionally,

where state actors act *in violation* of state procedures rather than pursuant to them, as Plaintiff

alleges here, Compl. ¶¶ 29, 117, post-deprivation remedies are adequate to satisfy due process.

See Capul v. City of N.Y., 2020 WL 2748274, at *13 (S.D.N.Y. May 27, 2020) (finding post-

deprivation remedies sufficient because "defendants had *violated* state procedures, rather than

acted pursuant to such procedures") (citing Hellenic Am. Neighborhood Action Comm. v. City

of N.Y., 101 F.3d 877 (2d Cir. 1996) and Carnell v. Myers, No. 17-CV-7693, 2019 WL

1171489, at *5–6 (S.D.N.Y. Mar. 13, 2019))).

New York State law provides for a hearing under Article 78, in which a Plaintiff may

raise the question, among others, of whether a state officer's "determination was made in

violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or

an abuse of discretion." N.Y. Civ. Prac. L. & R. 7803. Article 78 hearings are considered to

constitute sufficient process to challenge the actions of state officials. Newman v. SUNY

Broome Cmty. College et al., 2021 WL 3518306, at *4 (N.D.N.Y. May 6, 2021) ("Article 78

proceedings provide an adequate remedy for those who seek to challenge any action or inaction by an administrative agency or officers of state or local government." (quoting Hourihan v. Lafferty, 58 F. Supp. 2d 10, 15 (N.D.N.Y. 1999))).

Additionally, many courts have found the post-deprivation process afforded by Article 78 is *per se* sufficient to preclude a procedural due process claim in the school discipline context. See Attallah v. N.Y. Coll. of Osteopathic Med., 643 F. App'x 7 at 9–10 (2d Cir. 2016) (holding disciplined student "could not plausibly claim the deprivation of a protected interest without due process of law because an adequate post-deprivation remedy in the form of an Article 78 proceeding was available"); Moskowitz v. Great Neck Union Free Sch. Dist., No. 20-CV-1659, 2021 WL 4268138, at *15 (E.D.N.Y. Aug. 4, 2021) (citing Cohn, 363 F. Supp. 2d at 433–34 (N.D.N.Y. 2005)) (finding availability of Article 78 proceeding precluded due process claim because "it is well-established in the context of [school] disciplinary proceedings, such as those at issue here, that post-discipline due process provides sufficient due process to satisfy the requirements of the Fourteenth Amendment."). Plaintiff himself described the proceedings at issue as disciplinary. See Resp. at 6, 17, 19, 20.

Had Plaintiff instituted an Article 78 hearing, he would have been able to confront and present the evidence that was allegedly withheld from him until just before the Commissioner's adjudication. Such a hearing would have been meaningful in that it would have offered him the opportunity to answer any stigmatizing charges and clear his name of any false statements, thus curing the alleged injury to his reputation. Paterson, 370 F. 3d at 335 (stating that appropriate remedy for stigma-plus claim "is a post-deprivation name-clearing hearing . . . [that] gives the plaintiff an opportunity to hear and answer first-hand any stigmatizing charges, clearing his name of any false statements made about him, and curing the injury to his reputation."); Rys v. Grimm,

No. 6:19-CV-1251, 2021 WL 827671, at *10 (N.D.N.Y. Mar. 4, 2021) ("[E]ven assuming arguendo that Plaintiff had sufficiently alleged the elements of a stigma-plus claim, the Court finds that Plaintiff fails to state a claim upon which relief can be granted because she could have used an Article 78 proceeding to clear her name and did not do so."). Further, the New York state court could have meaningfully addressed any damage done by breach of Plaintiff's contract rights. See S & D Maint. Co. v. Goldin, 844 F.2d 962, 966 (2d Cir. 1988) ("[E]ven if all public contract rights warranted the procedural protections of due process, there would be a substantial argument that in most circumstances post-deprivation state court remedies would provide all the process that is due."); Radwan, 465 F. Supp. 3d at 107 n.4 (finding that even if plaintiff had established cognizable contractual interest, Article 78 proceedings afforded sufficient post-deprivation remedy). Indeed, Plaintiff has not argued that such a hearing would be inadequate.[18]

Therefore, the Court grants Defendants' Motion to Dismiss with respect to Plaintiff's procedural due process claim.

### J.  Title IX

Title IX mandates that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681.

---

[18] The availability of a post-deprivation breach of contract action may also remedy any defects in the initial process given to Plaintiff for deprivation of his alleged contract rights. Id. at 103 n.7 (noting that procedural due process may be satisfied where plaintiff has available 'in addition to Article 78 review, a breach of contract claim'); Attallah, 643 F. App'x 7 (2d Cir. 2016) (holding that if a plaintiff's "claims are the type suitable for judicial review in a breach of contract action, the availability of that remedy reinforces the conclusion that [they were] not denied procedural due process."); Storey v. Morris, No. 16-CV-0206, 2017 WL 933212, at *3 (N.D.N.Y. Feb. 1, 2017) (same).

To state a claim under Title IX, a plaintiff must establish that (1) the defendant discriminated against him on the basis of gender or sex, (2) the discrimination was intentional, and (3) discrimination was a substantial and motivating factor for the defendant's action. Doe v. Columbia Univ., 101 F. Supp. 3d 356, 367 (S.D.N.Y. 2015) (citing Tolbert v. Queens Coll., 242 F.3d 58, 69 (2d Cir. 2001)). Accordingly, Title IX bars imposition of discipline or sanctions by an educational institution that receives federal funding "when gender is a motivating factor in the decision." Doe v. Columbia Univ., 831 F.3d 46, 53 (2d Cir. 2016) (quoting Yusuf v. Vassar College, 35 F.3d 709, 714 (2d Cir. 1994)).

In the Second Circuit, when a plaintiff attacks educational disciplinary proceedings on the grounds of gender bias, there are generally two avenues by which they may meet the aforementioned three prongs to establish a Title IX claim. In the first avenue, commonly referred to as a claim of "erroneous outcome," "the claim is that the plaintiff was innocent and wrongly found to have committed an offense." Yusuf, 35 F.3d at 715. The second avenue, commonly referred to as a claim of "selective enforcement," asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender. Doe v. New York University, 438 F. Supp. 3d 172, 181 (S.D.N.Y. 2020). Under either theory a plaintiff must "allege particular circumstances suggesting that gender bias was a motivating factor . . . ," Yusuf, 35 F.3d at 715, but a plaintiff's allegations need support only a "minimal plausible inference" of bias, Columbia, 831 F.3d at 55.

The Court finds Plaintiff has alleged sufficient facts to support a claim of erroneous outcome regarding the disciplinary proceedings undertaken by Defendants.

To survive a motion to dismiss an erroneous outcome claim, a plaintiff must allege (1) "particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the

disciplinary process," and (2) "particular circumstances suggesting that gender bias was a motivating factor." Haas, 427 F. Supp. 3d at 354 (quoting Yusuf, 35 F.3d at 715).

### 1. Articulable Doubt

The pleading burden to satisfy the articulable doubt requirement has been described by the Second Circuit as "not heavy." Yusuf, 35 F.3d at 715. "[A] complaint may allege particular evidentiary weaknesses behind the finding of an offense such as a motive to lie on the part of a complainant or witnesses, particularized strengths of the defense, or other reason to doubt the veracity of the charge." Id. A plaintiff may also allege procedural flaws that affected the proof. Id.

Plaintiff attacks the veracity of the allegations of which he was found guilty. The Complaint states that (1) Monroe provided a false description of the Bracket to the Board and this description informed their decision, id. ¶¶ 45–46, (2) Monroe falsely represented to the Board the substance of her phone conversation with Plaintiff, id. ¶ 52, (3) Monroe stated that she was personally offended by a passage in Plaintiff's book, id. ¶ 39, leading to a plausible inference that she had a motive to lie in providing information to the board, (4) Plaintiff was not provided with notice of the false information Monroe gave to the board until immediately before the Commissioner issued his decision denying Plaintiff's request for a stay, when it was too late to refute, id. ¶ 53, (5) the Board refused to explain the reasoning for their decision, id. ¶ 48, and finally, (6) the District and Monroe considered the opinions and allegations of a few girls and their parents who opposed Plaintiff speaking, but did not consider the input of Plaintiff's "teachers, counselors, male students, and other students" who supported him, id. ¶¶ 67–68.

Further, Plaintiff alleges several procedural flaws. The Complaint states that the District Code of Conduct specified procedural and substantive requirements for imposing sanctions on

students, but that Defendants entirely discarded the Code when imposing sanctions on Plaintiff. Compl. ¶ 29. Indeed, it is alleged Defendants openly admitted they did not comply with the procedural requirements of the Code of Conduct. Id. ¶¶ 29, 56.

The Court finds these alleged procedural flaws, potential motive to mislead the board on part of Monroe, and evidentiary weaknesses are sufficient to meet the "not heavy" requirement that Plaintiff allege facts sufficient to cast some articulable doubt on the accuracy of the outcome of Defendants' disciplinary proceedings.

### 2. Gender Bias as a Motivating Factor

The Court reaches a similar conclusion regarding the second prong of the erroneous outcome test, which requires a plaintiff to allege particular circumstances suggesting that gender bias was a motivating factor leading to the erroneous outcome. As noted above, to establish this prong, a plaintiff need only allege facts that support a "minimal plausible inference" of discriminatory intent. Columbia, 831 F.3d at 55.

In support of his claim of gender bias, Plaintiff alleges that Monroe and the Board were predominantly female, Compl. ¶ 73, they chose a lower ranked female student to replace Plaintiff as speaker, id. ¶ 70, Monroe had expressed displeasure regarding the statement in Plaintiff's book regarding the differences between men and women, id. ¶ 39; Resp. at 21, and perhaps most importantly, Plaintiff alleges Monroe and the Board relied solely on objections and statements from female students and their parents, while ignoring statements of males, id. ¶¶ 68, 72.

The Court also finds these allegations sufficient to create a minimal inference that Defendants' actions were motivated by gender bias.[19] Plaintiff's allegation that Defendants only

---

[19] The Court acknowledges that Plaintiff does not allege any general pressure on Defendants to find in favor of females and against males like has existed in other cases. See, e.g., Menaker, 935

accepted statements from female students and their families, but not from males, is sufficient to meet Plaintiff's minimal burden. *General* bias against an accused has been found to exist where an educational institution considers statements form individuals with relevant knowledge, but declines to explore such statements from persons supporting an accused. Menaker, 935 F.3d at 34; Columbia, 831 F.3d at 57. Similarly then, where defendants decline to explore statements made by members of a plaintiff's protected group, but do take into account statements made by individuals outside that group, this leads to a minimal inference that defendants' actions are motivated by bias based on plaintiff's membership in that group.

Additionally, Plaintiff alleges he was replaced as graduation speaker by a female student who scored lower than he did in the speech competition. Compl. ¶ 70. In similar contexts, removing a member of a protected group from a meaningful position and replacing them with someone outside of that protected group is regularly found sufficient to create a minimal inference of bias related to that protected group. See e.g., Zimmermann v. Assocs. First Capital Corp., 251 F.3d 376, 381 (2d Cir. 2001) (finding inference of gender-based discrimination in Title VII context because "the mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination"); Soderberg v. Gunther Int'l, Inc., 124 F. App'x 30, 31–32 (2d Cir. 2005) (finding inference of discriminatory intent based on age in ADEA suit where plaintiff was terminated and "defendants filled her position with a forty-two-year-old employee, twenty years her junior").

F.3d at 34; Columbia, 831 F.3d at 56. In these cases, external pressure was noted to be sufficient for an inference of discriminatory intent, but it was not held to be *required*. See id.; See also Doe v. Haas, 427 F. Supp. 3d 336, 356–57 (E.D.N.Y. 2019) (finding minimal inference of bias against male student in disciplinary proceedings even absent allegations of public pressure regarding sexual assault claims).

Accordingly, Defendants' Motion to Dismiss is denied as to Plaintiff's claim for violation of Title IX.

### K.  Title VI

To state a claim for a violation of Title VI, "a plaintiff must plausibly allege that (1) the defendant discriminated against [him] on the basis of race, color, or national origin; (2) the discrimination was intentional; and (3) the discrimination was a substantial or motivating factor for the defendant's actions." Bailey v. New York Law School, 2017 WL 6611582, at *13 (S.D.N.Y. 2017) (citing Tolbert, 242 F.3d at 69). Similar to Title IX claims, a plaintiff must only "alleg[e] facts giving rise to a plausible minimal inference of bias" on the basis of race. Vengalattore v. Cornell Univ., 36 F.4th 87, 103–04 (2d Cir. 2022).

Defendants argue that, to the extent Plaintiff alleges Title VI claims based on a theory of disparate treatment, the claims must be dismissed because Plaintiff has not identified other, similarly situated students who were treated differently, and Plaintiff has not otherwise alleged facts from which it can be inferred discrimination was a substantial or motivating factor for Defendants' action. Defs.' Mem. at 21–22.

#### 1. Similarly Situated Comparators

The Court agrees that Plaintiff has not sufficiently alleged a claim of disparate treatment. "A plaintiff relying on disparate treatment evidence 'must show [he] was similarly situated in all material respects to the individuals with whom [he] seeks to compare [him]self.'" Mandell v. County of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003) (quoting Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000)). Conclusory statements that a plaintiff was treated differently than other groups "are insufficient to raise a plausible claim for relief under Title VI." Id. (citing Kajoshaj v. N.Y. City Dep't of Educ., 543 Fed. Appx. 11, 14 (2d Cir. 2013) (collecting cases)).

66

Plaintiff has not adequately alleged facts identifying similarly situated individuals. Plaintiff points to one female white student who was allowed to speak at graduation in his place. See Compl. ¶¶ 70, 72. However, the Complaint does not allege that this student was similarly situated in all material respects. For instance, the Complaint does not indicate whether she, or any other student, was the subject of complaints regarding her role at graduation or had been accused of conduct similar to Plaintiff's, such that they were similarly situated when being considered for a position as a graduation speaker or facing punishment for that conduct.

Plaintiff also argues that Defendants "considered the possible upset of their decisions only on some girls and families with girls" and not on Plaintiff. Resp. at 22. However, this bare allegation that Plaintiff was treated differently than some members of a different class, without factual allegations concerning how they were similarly situated, is insufficient. See Minto v. Molloy Coll., No. 16-CV-276, 2019 WL 4696287, at *10 (E.D.N.Y. Sep. 26, 2019) ("[W]ithout specific factual allegations concerning these allegedly similarly situated individuals, [plaintiffs'] bare conclusion cannot survive a motion to dismiss.") (quoting Kajoshaj v. City of N.Y., No. 11-CV-4780, 2013 WL 249408, at *2 (E.D.N.Y. Jan. 23, 2013)).

Indeed, Plaintiff does not argue he has established similarly situated comparators beyond quoting a conclusory statement from the Complaint. Resp. at 21 ("[T]he District and Monroe 'intentionally treated Wang different from others similarly situated and discriminated against Wang'") (quoting Compl. ¶ 66).

However, disparate treatment is only one avenue among several by which a plaintiff may raise an inference of discriminatory motivation. Concha v. Purchase Coll. State Univ. of N.Y., No. 17-CV-8501, 2019 WL 3219386, at *7 (S.D.N.Y. July 17, 2019) (describing establishing disparate treatment as one "recognized method of raising an inference of discrimination.");

Patane v. Clark, 508 F.3d 106, 112 (2d Cir. 2007) (stating one way female could have supported her claim that defendants' actions were motivated by gender was to "allege that any male employees were given preferential treatment when compared to Plaintiff.").

### 2. *Discrimination as a Substantial or Motivating Factor*

The Court finds that Plaintiff has otherwise alleged facts raising an inference that discrimination was a motivating factor for Defendants' actions sufficient to meet the standard set forth in Tolbert.

As stated above, at this stage of pleading, a plaintiff need only "alleg[e] facts giving rise to a plausible minimal inference of bias" on the basis of race. Vengalattore, 36 F.4th at 103–04. "Courts should take an expansive approach to identifying evidence of discriminatory intent, as 'plaintiffs in discrimination suits often must rely on the cumulative weight of circumstantial evidence,' and a defendant 'is unlikely to leave a smoking gun.'" Minto, 2019 WL 4696287, at *8 (cleaned up) (quoting Norton v. Sam's Club, 145 F.3d 114, 119 (2d Cir. 1998)) Courts must likewise be mindful that "[t]he plausibility standard is not akin to a 'probability requirement,'" a plaintiff must only "allege enough to 'nudge[] their claims across the line from conceivable to plausible.'" Vega, 801 F.3d at 87 (quoting Iqbal, 556 U.S. at 680).

At this stage of litigation, a plaintiff is not required to establish a prima facie case of discrimination under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Vega, 801 F.3d at 84. A court may, however, treat the elements of the prima facie case as an outline, or guideposts, to determine if a plaintiff's claim of discrimination is plausible. See Vega, 801 F.3d at 84 n.7 ("The elements of a prima facie case may be used as a prism to shed light upon the plausibility of the claim.") (quoting Rodriguez-Reyes v. Molina-Rodriguez, 711 F.3d 49, 54 (1st Cir. 2013)); see also Sosa v. New York City Dep't of Educ., 368

F. Supp. 3d 489, 495 (E.D.N.Y. 2019) ("[O]n a motion to dismiss, the court treats the elements of a prima facie case as 'an outline of what is necessary to render a plaintiff's . . . discrimination claims for relief plausible.'") (quoting <u>Barrett v. Forest Labs., Inc.</u>, 39 F. Supp. 3d 407, 429 (S.D.N.Y. 2014)).

When a plaintiff is denied a specific, meaningful position, or is removed from such a position, and the plaintiff alleges such denial or removal was undertaken due to his membership in a protected class, he may establish a prima facie case by demonstrating that (1) he is a member of a protected class; (2) he was qualified for the position, (3) he was rejected from a position he applied for or removed from a position he held, and (4) the adverse action "occurred under circumstances giving rise to an inference of discrimination." <u>See</u> <u>Aulicino v. New York City Dep't of Homeless Servs.</u>, 580 F.3d 73, 80 (2d Cir. 2009) (applying standard where state officials denied plaintiff's application for a certain position at the Department of Homeless services); <u>Soderberg v. Gunther Int'l, Inc.</u>, 124 F. App'x 30, 31–32 (2d Cir. 2005) (applying standard where plaintiff was removed from position); <u>Zimmermann v. Assocs. First Capital Corp.</u>, 251 F.3d 376, 31 (2d Cir. 2001) (same).

It is undisputed that Plaintiff, as an Asian male, is a member of a protected racial class, that he was qualified for the position of graduation speaker by virtue of placing first in the speech competition and scoring higher than his eventual replacement, Compl. ¶¶ 10, 70, and that he was either rejected or removed from that position after applying for it, <u>id.</u> ¶ 55. At issue is whether Plaintiff has alleged sufficient facts to infer that this removal occurred under circumstances giving rise to an inference of discrimination. The Court finds that he has.

Courts have consistently found a plausible inference of discrimination where a member of a protected class is rejected or removed from a certain position, and a person outside that

protected class is subsequently placed in that position. See, e.g., Howerton v. Bd. of Educ., No. 14-CV-0242, 2015 WL 4994536, at *9 (D. Md. Aug. 18, 2015) (finding plaintiff "has shown that he was rejected under circumstances giving rise to an inference of unlawful discrimination" under Title VI and Title VII because plaintiff alleged he applied for position, but it was filled by individual outside his protected class).[20] The Complaint clearly alleges that, after Plaintiff was removed from the position of graduation speaker, it was given to a white female who had ranked lower than him in the speech competition. Compl. ¶ 70. This is thus sufficient to raise an inference of discriminatory motive and intent.

While this specific issue arises most often in the Title VII employment context, Title VI and Title VII have almost identical requirements, employ identical analytical frameworks, and employ the same pleading requirements at the motion to dismiss stage. See Gabriel v. Albany Coll. of Pharmacy & Health Scis., No. 12-CV-14, 2013 WL 4456690, at *5 (D. Vt. Aug. 16, 2013) ("As Title VI and Title VII cases employ the same analytical framework, the same pleading standard applies here.") (citing Williams v. N.Y. City Hous. Auth., 458 F.3d 67, 72 (2d Cir. 2006) and Edwards, 898 F. Supp. 2d 516, 557 (E.D.N.Y. 2012)). Because Titles VI, VII, and IX have similar structures and goals, Courts addressing claims made under one Title often look

---

[20] See also, e.g., Feliciano v. City of N.Y., 2015 WL 4393163, at *4 (S.D.N.Y. July 15, 2015) ("The Circuit has held that when a plaintiff applies for and is denied a position, the fact that the position was filled by someone outside of the plaintiff's protected class is itself enough to give rise to [an inference of unlawful discrimination]" at the motion to dismiss stage.) (collecting cases); see also Soderberg, 124 F. App'x at 31–32 (finding inference of discriminatory intent in ADEA suit where plaintiff was terminated and "defendants filled her position with a forty-two-year-old employee, twenty years her junior"); Zimmermann v. Assocs. First Capital Corp., 251 F.3d 376 (2d Cir. 2001) (holding that, in title VII termination context, "the mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination"); Anderson v. N.Y.C. Health & Hosps. Corp., No. 16-CV-1051, 2020 WL 2866960, at *12 (S.D.N.Y. Mar. 2, 2020) ("[To establish] circumstances giving rise to an inference of discrimination, . . . plaintiff need only show that he was denied the position sought and an individual outside of his protected class was hired instead."); see also

to similar claims made under the other Titles for guidance. See, e.g., Yusuf, 35 F.3d at 714

("Because the statutes share the same goals and because Title IX mirrors the substantive

provisions of Title VI . . . courts have interpreted Title IX by looking to the body of law

developed under Title VI, as well as the caselaw interpreting Title VII.") (citations omitted);

N.Y.C. Envtl. Justice All. v. Giuliani, 214 F.3d 65, 69 (2d Cir. 2000) (observing that courts in

Title VI cases look to similar Title VII cases for guidance). Further, the factual parallels between

Title VII employment cases applying this standard and the current circumstances are strikingly

similar. In both sets of circumstances, (1) the plaintiff holds a position or has applied for a

position, (2) defendant decisionmakers ostensibly must evaluate merit and other criteria to

determine whether to allow the plaintiff to remain in that position or determine to whom to give

the position, (3) the plaintiff is removed or rejected, and (4) another is given it in his place. Most

importantly, the key issue in both sets of circumstances is whether the removal or rejection gives

rise to an inference of discriminatory motivation.[21] See supra n.18. Thus, the Court finds, as

other courts have, that the replacement of Plaintiff with a person outside his protected class is

sufficient to provide a minimal plausible inference of discrimination.[22]

---

[21] One potential difference is that, while employment is regularly found sufficiently important that actions affecting it are deemed adverse and discriminatory, it may be that not all school-related positions held by students are important enough that removing a student from that position would constitute a "discriminatory act" sufficient to meet the first prong of Tolbert, 242 F.3d at 69. See Ikedilo v. Statter, No. 19-CV-9967, 2020 WL 5849049, at *8 (S.D.N.Y. Sep. 30, 2020) (finding in Title VI discrimination case that "a plaintiff must establish . . . she suffered an adverse . . . action") (quoting McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S. Ct. 1817, 36 L. Ed. 2d 668, (1973)); see also Vega, 801 F.3d at 85 (2d Cir. 2015) (requiring adverse action in employment discrimination). But given the unique circumstances of this case, and interpreting the allegations in the light most favorable to Plaintiff, the Court has already found it reasonable to infer that Defendants' actions constitute a sufficiently adverse action. See supra Section IV(F)(2).

[22] At least one court in this Circuit has also imported the Title VII denial-of-position analysis when evaluating a factually similar Title VI claim. See Ikedilo, 2020 WL 5849049, at *8

Defendants correctly state the Complaint sets forth other grounds on which it could be inferred Plaintiff was removed from his position, namely that Defendants were motivated by "complaints the District received from other students and parents about Plaintiff's past conduct," Defs.' Mem. at 22. However, even where a complaint gives other possible reasons for a defendant's conduct, "[w]hether there existed non-pretextual, non-discriminatory explanations . . . is not properly decided on a motion to dismiss." Feliciano, 2015 WL 4393163, at *6 (S.D.N.Y. July 15, 2015) (quoting Green v. District Council 1707, 600 F. App'x 32, 33 (2d Cir. 2015)).

### L.  Title VI and Title IX Claims Against Individuals

 "The proper defendant in a Title VI action 'is the entity that receives federal financial assistance, not an individual.'" Milione v. City Univ. of New York, 950 F. Supp. 2d 704, 708–09 (S.D.N.Y. 2013) (quoting Kelly v. Rice, 375 F. Supp. 2d 203, 208 (S.D.N.Y. 2005)), aff'd, 567 F. App'x 38 (2d Cir. 2014). Similarly, Title IX "has consistently been interpreted as not authorizing suit against school officials, teachers, and other individuals." Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246, 257 (2009).

Thus, to the extent Plaintiff asserts Title IX and VI claims against Monroe in her individual capacity, those claims are dismissed.

## V.    CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Defendants' Motion to Dismiss (Dkt. No. 14) is **DENIED** in part and **GRANTED** in part; and it is further

---

(importing Title VII framework for establishing a prima facie denial of position claim for plaintiff's Title VI discrimination claim (citing Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000))).

**ORDERED**, that Plaintiff's requested relief contained in section (n) of his prayer for relief is dismissed due to lack of standing; and it is further

**ORDERED**, that Plaintiff's claims for violation of Fourteenth Amendment substantive due process (Count III); Fourteenth Amendment procedural due process (Count IV); N.Y. Human Rights Law and the District Policies and Code of Conduct (Count VII); and claims for breach of contract (Count VIII); common law due process (Count IX); and negligent infliction of emotional distress (Count X) are dismissed; and it is further

**ORDERED**, that Defendants' Motion to Dismiss is denied as to Plaintiff's claims for First Amendment retaliation (Count I); First Amendment Viewpoint Discrimination (Count II); violation of Title IX (Count V); and violation of Title VI (Count VI); and it is further

**ORDERED**, that Plaintiff's claims for violation of Title IX (Count V); and violation of Title VI (Count VI) are dismissed to the extent they are brought against Defendant Monroe in her individual capacity; and it is further

**ORDERED**, that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:     August 8, 2022
              Albany, New York

LAWRENCE E. KAHN
United States District Judge

73